UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                      Case No. 14-cr-20216

v                                         Honorable Thomas L. Ludington

D-1    STEVEN J. INGERSOLL,
D-2    DEBORAH M. INGERSOLL,
D-3    GAYLE R. INGERSOLL,
D-4    ROY C. BRADLEY, SR.,
D-5    TAMMY S. BRADLEY,

                Defendants.

_____/

**ORDER GRANTING MOTION FOR BILL OF PARTICULARS, DIRECTING THE GOVERNMENT TO FURNISH A BILL OF PARTICULARS WITHIN FOURTEEN DAYS, DENYING MOTION TO SEVER, DENYING MOTION TO PRODUCE CONFIDENTIAL INFORMANTS, AND GRANTING MOTION FOR LEAVE TO FILE**

Steven Ingersoll is an optometrist and businessman residing in Bay City, Michigan. According to the Superseding Indictment, he purchased an older church in Bay City, Michigan to convert it for use by the Bay City Academy, a charter school, during the spring of 2010. Steven Ingersoll is also a principal in Madison Arts, LLC ("Madison"), the entity that developed the Bay City Academy property. Roy Bradley is a contractor engaged by Madison in October of 2010 to convert the church into a school.

Defendants Steven Ingersoll, his wife Deborah Ingersoll, his brother Gayle Ingersoll, Roy Bradley, and Roy Bradley's wife Tammy Bradley were indicted for various crimes related to their alleged participation in a conspiracy to commit bank fraud. The Superseding Indictment charges the Defendants as follows:

- Count 1 charges Steven Ingersoll, Deborah Ingersoll, Gayle Ingersoll, Roy Bradley, and Tammy Bradley with conspiracy to defraud a financial institution related to a Chemical Bank loan on January 2011, 18 U.S.C. § 1349.

- Count 2 charges Steven Ingersoll, Gayle Ingersoll, and Roy Bradley with conspiracy to commit tax evasion related to the use of the January 2011 Chemical Bank loan, 18 U.S.C. § 371.

- Count 3 charges Steven Ingersoll with wire fraud on June 29, 2011, related to the January 2011 Chemical Bank Loan, 18 U.S.C. § 1343.

- Count 4 charges Steven Ingersoll and Tammy Bradley with wire fraud on June 30, 2011, related to the January 2011 Chemical Bank Loan, 18 U.S.C. § 1343.

- Count 5 charges Steven Ingersoll and Gayle Ingersoll with wire fraud on June 30, 2011, related to the January 2011 Chemical Bank Loan, 18 U.S.C. § 1343.

- Count 6 charges Steven Ingersoll with failure to report taxable income for the year 2009, 26 U.S.C. § 7201.

- Count 7 charges Steven Ingersoll with failure to report taxable income for the year 2010, 26 U.S.C. § 7201.

Superseding Indictment 1-12, ECF No. 1.

Various Defendants have filed motions regarding the charges against them:

- Steven Ingersoll filed a motion for a bill of particulars regarding Counts 6 and 7 of the Superseding Indictment.  ECF No. 48.

- Roy Bradley, Deborah Ingersoll, and Gayle Ingersoll filed a motion to sever Counts 6 and 7 due to improper joinder.  ECF Nos. 44, 47, 49.

- Steven Ingersoll, Deborah Ingersoll, and Gayle Ingersoll filed a motion to produce confidential informants and exculpatory information.  ECF No. 45, 49.

- Steven Ingersoll and Gayle Ingersoll filed a motion for leave to file future evidentiary motions.  ECF No. 46, 49.

A hearing was conducted on October 8, 2014,[1] during which the Assistant United States Attorney outlined much of the factual background to the Superseding Indictment.

# I

According to the Government, this case began in 2009 when Steven Ingersoll caused another charter school that he owned or controlled—the Grand Traverse Academy—to advance him funds that needed to be repaid. Counts 6 and 7 of the Superseding Indictment relate specifically to those advances and Steven Ingersoll's personal income tax treatment of those transactions in 2009 and 2010. The Superseding Indictment alleges—the Court infers—that Steven Ingersoll either mischaracterized or omitted the advances from his personal income tax returns.

Steven Ingersoll, then acting in concert with Roy Bradley "conspired" to "induce Chemical Bank, an FDI insured depository institution to approve a $1.8 million construction line of credit loan to Madison" to finance the construction work for Madison in Bay City. Rather than using the funds for the Bay City construction project, Steven Ingersoll used the loan proceeds to repay the advances from Grand Traverse Academy. Indeed, the Superseding Indictment alleges that all five of the Defendants conspired to a series of transactions that diverted at least part of the funds required to be used on the Bay City Academy project to the Ingersolls' personal bank account at Fifth-Third Bank.

Count 2 charges Steven Ingersoll, Gayle Ingersoll, and Roy Bradley with a conspiracy to defraud the United States "related to the use of the Chemical Bank loan," all of which occurred in June 2011. And Count 3, 4, and 5 allege three different wire fraud transactions "related to the Chemical Bank loan." Count 3 references a $704,000.00 electronic funds transfer from Madison

---

[1] Mr. Sasse appeared on behalf of both Deborah Ingersoll and Gayle Ingersoll, with permission, for purposes of this hearing only.

Arts, LLC to Roy and Tammy Bradley's construction company's account. Count 4 then references a $704,000.00 transfer of funds from the Bradley's construction company's account to Gayle Ingersoll's business account. And, finally, Count 5 references a $704,000.00 transfer from Gayle Ingersoll's business account to Steven and Deborah Ingersoll's personal bank account.

### A

As noted above, the Government contends that Ingersoll and all of the Defendants secured the Chemical Bank loan solely intended for use at the Bay City Academy, a charter school, in order to repay funds he had directed to himself from Grand Traverse Academy, also a charter school. Charter schools in Michigan are referred to as "public school academies." Mich. Comp. Laws § 380.501. Generally stated, public school academies have been defined as a combination of public and private schools. Jason Lance Wren, *Charter Schools: Public or Private? An Application of the Fourteenth Amendment's State Action Doctrine to These Innovative Schools*, 19 Rev. Litig. 135, 136 (2000). Most public school academies share three characteristics: (1) a privately organized corporation or "entity"; (2) a contract or "charter" with the state and organizing body; and (3) some state funding.[2] Mich. Comp. Laws §§ 380.501-380.507 (2012).

A private entity[3] may organize a public school academy in Michigan by proposing a contract to an authorizing body, such as a local school board. Mich. Comp. Laws § 380.512(2)(a). The authorizing body then approves the contract and confers authority on the private entity to operate the public school academy. Mich. Comp. Laws § 380.502. During the

---

[2] In Michigan, funding to school districts is predominantly based on pupil head counts. "Per pupil funding provides that if a student leaves a traditional public school for a PSA, that state money received by the school leaves with him or her." Peters, at 563.

[3] "An entity can be a partnership, nonprofit or business corporation, labor organization, or any other association, corporation trust, or other legal entity." Mich. Comp. Laws § 380.501(e),

public school academy formation process, the private entity proposes members of the board of directors for the public school academy.  *Id*. at §380.502(3)(b).

During the formation of the public school academy, the management company is introduced.  Management companies are for-profit, private corporations that serve as third party contractors for the charters:

> Management companies are hired by the board of directors to complete many of the needed tasks for the formation and operation of the PSA.  These companies' most commonly contracted obligations are the hiring and firing of staff, custodial duties, accounting, payroll, taxes, book-keeping, organizing parent-teacher conferences, developing and maintaining budgets, securing of supplies, dealing with vendors, and facilitating the overall startup of the school.  Unlike the regulatory and administrative restraints faced by public schools, charter school management companies are allowed more autonomy in the performance of their duties.

Tracy Peters, *Demanding More from Michigan's Charter Schools*, 13 J. L. Society 555, 559 (2012).

## B

Steven Ingersoll began the Grand Traverse Bay Academy,[4] and he owned and operated Smart School Management and Smart Schools, Incorporated,[5] the management companies that run the Academy.  The Government contends that Steven Ingersoll misused his authority to improperly advance himself funds from the Academy—as much as three million dollars.  According to defense counsel, Smart Schools Management's accounting always reflected the advances from Smart Schools Management to Ingersoll as accounts receivable (a practice the

---

[4] Grand Traverse Academy files annual Form 990s, but those tax documents have not been released to the Government.  Supp. Brief 2 n.1, ECF No. 58.  Neither the Government nor Defendants' counsel were familiar with who the board of directors or officers were during the relevant periods of time.

[5] Smart Schools Management is a private, for-profit "C" corporation that is responsible for annual Form 1120 tax returns.  The composition of stock ownership and the membership of the board are unknown.  In contrast, Smart Schools, Incorporated, is an "S" corporation.  Supp. Brief 2 n.2.  According to the Government, both Smart Schools Management and Smart Schools, Incorporated, were controlled by Steven Ingersoll during the relevant time period. *Id*.

Government contends is prohibited by law) that were later re-characterized.[6]  The Government, in contrast, contends that "the Forms 1120 filed by Steven Ingersoll with the IRS on behalf of Smart Schools Management do not reflect the payments at issue."  Supp. Br. 3.

In addition to providing the factual circumstances for Counts 6 and 7, the Government also alleges that these improper advances became the cause for Steven Ingersoll's involvement in the bank fraud and tax evasion conspiracies alleged in Counts 1 and 2.  The Government alleges that, once Steven Ingersoll fell too far into debt—at one time owing three to four million dollars to Grand Traverse Academy—it became necessary for him to try to repay the indebtedness in another way: "count 1 alleges, in part, that Steven Ingersoll sought to use $934,000 of bank construction loan proceeds to reduce his indebtedness to the Grand Traverse Academy.[7]

## C

Along the way, the Government alleges that Co-Defendants Deborah Ingersoll, Gayle Ingersoll, Roy Bradley, and Tammy Bradley joined in on the criminal activities.  The bank fraud conspiracy—which all Defendants are charged with in Count 1—stems more specifically from a $1.8 million construction line of credit from Chemical Bank in Bay City, Michigan, in January 2011.[8]  The line of credit was accessed by Roy Bradley, acting on behalf of Madison Arts, LLC.[9]  Roy Bradley, as contractor, obtained the construction loan "to fund the conversion of the church into a school"—the Bay City Academy.[10]  Superseding Indictment 3.

In June 2011, Roy Bradley and Steven Ingersoll submitted draw requests totaling $704,000 to Chemical Bank transferred those funds to the Madison Arts, LLC bank account.

---

[6] Although the Government alleges that the improper advances were made by Smart Schools Management, the Government also alleges "that a significant part of the money at issue from Smart Schools Management reached Steven Ingersoll via Smart Schools, Inc."  Supp. Brief 2 n.2.
[7] The Superseding Indictment, although listing numerous transactions between Defendants and Chemical Bank, does not identify which of those transactions comprise the fraud on the bank or how they were a fraud on the bank.
[8] The loan was guaranteed by the United States Department of Agriculture.  Superseding Indictment 3.
[9] The corporate structure and ownership of the Madison is unclear, as well as Bradley's relationship to Madison.
[10] Bay City Academy appears to be another public school academy created by Steven Ingersoll.

Steven Ingersoll then transferred $704,000 to Roy Bradley and Tammy Bradley's construction company's credit union account. Tammy Bradley then transferred the $704,000 to Gayle Ingersoll's business account. Gayle Ingersoll then transferred the $704,000 to Steven Ingersoll and Deborah Ingersoll's joint, personal bank account at Fifth-Third Bank.[11] Once the $704,000 was in Steven and Deborah Ingersoll's personal account, Steven Ingersoll was able to use the money to repay Grand Traverse Academy.

In summary, the bank fraud conspiracy allegedly began when Steven Ingersoll submitted a $704,000 draw request to Chemical Bank supported by Roy Bradley's certification of construction work in Bay City. This $704,000, after a series of transfers, ended up in Steven Ingersoll and Deborah Ingersoll's joint account.[12] From there, Steven Ingersoll was able to use the funds to reduce his indebtedness to the Grand Traverse Academy.

## II

In the first motion, Steven Ingersoll requests a written bill of particulars as to Counts 6 and 7 of the Superseding Indictment, which charge him with tax evasion and/or fraud. Federal Rule of Criminal Procedure 7(f) allows a defendant to seek a bill of particulars in order to (1) ensure that a defendant understands the nature of the charges against him so that he can adequately prepare for trial; (2) avoid or minimize the danger of unfair surprise at trial; and (3) enable the defendant to plead double jeopardy if he is later charged with the same defense "when the indictment itself is too vague and indefinite for such purposes." *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976). Thus, the test in ruling on a motion for a bill of particulars is

---

[11] The transfers appear to form the basis of the wire fraud charges against Steven Ingersoll (Count 3, 4, and 5), Tammy Bradley (Count 4), and Gayle Ingersoll (Count 5).

[12] The tax evasion conspiracy charge in count 2 alleges, that Steven Ingersoll, Gayle Ingersoll, and Roy Bradley sought to evade the tax consequences of the diverted bank construction loan proceeds. Gov't Resp. 3, ECF No. 51 (citations omitted).

whether providing those details is necessary to the preparation of the defense and avoidance of prejudicial surprise. *United States v. Musick*, 291 F. App'x 706, 724 (6th Cir. 2008).

A motion for a bill of particulars lies within the sound discretion of the trial court. *United States v. Kendall*, 665 F.2d 126, 134 (6th Cir. 1981). The bill of particulars is not intended as "a means of learning the government's evidence and theories." *Id.* Moreover, a defendant is not entitled to a bill of particulars if the purpose of the bill is to obtain a list of the Government's witnesses or to discover all of the overt acts that might be proven at trial. *Id.*

Even where the indictment does not provide sufficient factual information, courts have denied such a request when substantial discovery materials have already been provided. *See United States v. Martell*, 906 F.2d 555, 558 (11th Cir. 1990); *United States v. Savides*, 661 F. Supp. 1024, 1028 (N.D. Ill. 1987). "A bill of particulars is not required when information needed for a defendant to prepare for trial can be obtained through some other satisfactory form, such as where the government has an open-file policy or has otherwise disclosed the information to the defendant." *United States v. Norman*, 2011 WL 2678821, at *2 (E.D. Ark. June 30, 2011). Thus a bill of particulars should not issue where the specifics requested by the defendant are readily available elsewhere. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

Here, the Superseding Indictment charges Steven Ingersoll with two counts of tax fraud or evasion:

### Count 6
### 26 U.S.C. § 7201

On or about May 11, 2010, in the Eastern District of Michigan, Northern Division, Steven J. Ingersoll, defendant herein, did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 2009, by causing to be prepared, and by signing and causing to be signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service. In that false income tax return, Steven Ingersoll stated that his and his

wife's taxable income for the calendar year was the sum of $278,377, and that the amount of tax due and owing thereon was the sum of $77,722, when in fact, as Steven Ingersoll then and there knew, their taxable income for calendar year 2009 was substantially in excess of the amount stated on the return, and, upon the additional taxable income, a substantial additional tax was due and owing to the United States of America, in violation of 26 U.S.C. § 7201.

## Count 7
### 26 U.S.C. § 7201

Between on or about October 21, 2011 and on or about April 5, 2012, in the Eastern District of Michigan, Northern Division, Steven J. Ingersoll, defendant herein, did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 2010, by causing to be prepared, and by signing and causing to be signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service. In that false income tax return, Steven Ingersoll stated that his and his wife's taxable income for the calendar year was the sum of $197,225, and that the amount of tax due and owing thereon was the sum of $49,351, when in fact, as Steven Ingersoll then and there knew, their taxable income for calendar year 2010 was substantially in excess of the amount stated on the return, and, upon the additional taxable income, a substantial additional tax was due and owing to the United States of America, in violation of 26 U.S.C. § 7201.

Superseding Indictment 12-14, ECF No. 24.

A review of the charges indicates that Steven Ingersoll is not entitled to a bill of particulars as a matter of right. Counts 6 and 7 of the Superseding Indictment tracks the language of the statute and, together with the extensive discovery already provided, are legally sufficient to inform Steven Ingersoll of the charges against him. *See United States v. Ross*, 2013 WL 3863962, at *3 (M.D. Pa. July 23, 2013) (denying bill of particulars seeking (1) the amount of income allegedly earned; (2) the additional tax allegedly due; (3) how defendant attested to the contents of the tax returns; and (4) whether the original or amended tax returns were at issue because the indictment tracked the language of the criminal statute and because the government had provided "extensive discovery" that would sufficiently inform defendant of the charges); *United States v. Liew*, 2013 WL 2605126, *8 (N.D. Cal. June 11, 2013) (a bill of particulars was

not warranted where the indictment identifies the tax years in question, the amount listed on the return, and alleges that the income "substantially exceeded that amount.").

Although the Superseding Indictment is legally sufficient, it is nonetheless generic and lacks factual specificity.  The Superseding Indictment does not identify the amount, date, or rationale for the funds that Steven Ingersoll and his wife allegedly received from Grand Traverse Academy but did not report.  In this case, some additional factual detail is necessary so that Steven Ingersoll can prepare his defense and minimize surprise at trial.  Thus, although Steven Ingersoll is not entitled as a matter of right to a bill of particulars, this Court will, in its discretion, direct the government to provide one.

Indeed, there are circumstances that make a bill of particulars necessary in this case. First, the accountant who prepared Steven Ingersoll's and Smart Schools' tax returns in 2009 (Count 6) died.  In addition, the accountant who prepared Steven Ingersoll's and Smart Schools' tax returns in 2010 (Count 7) is incorporating—thereby necessitating the hire of a new set of tax accountants to review Steven Ingersoll's 2009 and 2010 tax returns.   Second, counsel for Steven Ingersoll represented at the hearing that there were many transactions in 2009 and 2010 that could be the subject of the general characterizations alleged by the Government in the Superseding Indictment.

"[D]ue to the complex nature of tax evasion cases, several methods of proof have been developed," including the specific items method, net worth method, and bank deposit or expenditures method.  *United States v. Manfredi*, 628 F. Supp. 2d 608, 635-36 (W.D. Pa. 2009). As one court noted, each of these three methods of proof "entails proof of certain operative facts," and "[i]f the defendant is not aware of the particular method the Government will use, of necessity he must prepare a defense appropriate to each method of proof."  *United States v.*

*Goldstein*, 56 F.R.D. 52, 55 (D. Del. 1972).  Considering the complexity of this case and the voluminous amount of discovery, the Government will be directed to furnish a bill of particulars to Steven Ingersoll.

In criminal income tax cases, a defendant may be granted a bill of particulars as to (i) the specific method the government intends to use to prove the charge,[13] s*ee Manfredi*, 628 F. Supp. 2d at 635-363, *Goldstein*, 56 F.R.D. at 55; (ii) the computation and calculation of the specific items of income comprising defendant's actual taxable income and their source, and the deductions and costs allowed and disallowed against such income, *see United States v. Olivia*, 466 F. Supp. 719, 714 (W.D. Pa. 1979), rev'd on other grounds, 611 F.2d 23 (3d Cir. 1979); (iii) the dates, amount, character and source of the income allegedly received but not reported, *see Goldstein*, 56 F.R.D. at 56; and (iv) the specific entries or portions of the relevant tax returns that are allegedly false, *see United States v. Feil*, 2010 WL 4055576  at *4 (N.D. Cal. Oct. 14, 2010). Accordingly, the Government will be directed to provide, within twenty-one days of the date of this Order, a bill of particulars in which the Government shall generally describe the information listed above.

## III

In the second motion, Defendants Roy Bradley, Deborah Ingersoll, and Gayle Ingersoll request that Counts 6 and 7 be severed from the Superseding Indictment as misjoined and overly prejudicial.  The allegations in Counts 6 and 7 relate exclusively to Steven Ingersoll and his alleged tax evasion in 2009 and 2010.

## A

Rule 8 of the Federal Rules of Criminal Procedure provides:

---

[13] In its response, the Government indicates that it has already informed Steven Ingersoll that it will not be pursuing a "net worth" theory.  Resp. at 3, ECF No. 54.

(a) The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged are of the same or similar character, or based on the same act or transactions, or are connected with or constitute parts of a common scheme or plan.

(b) The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transactions, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

The Defendants first argue that Counts 6 and 7 are misjoined because there is no connection between the crimes alleged in Counts 1-5 and Steven Ingersoll's alleged crimes set forth in Counts 6 and 7. They contend that Steven Ingersoll's tax fraud and evasion counts do not arise out of the "same series of acts or transgressions" alleged in Counts 1-5 and were thus improperly joined.

On the contrary, a review of the Superseding Indictment indicates that Counts 6 and 7 against Steven Ingersoll were properly joined. The Government suggests that the evidence relating to Counts 6 and 7 may be relevant to the central charges in the Superseding Indictment—conspiracy to commit bank fraud, which all Defendants are charged with. Specifically, Steven Ingersoll allegedly committed the bank fraud conspiracy (Count 1)—which all Defendants are charged with[14]—and the tax fraud conspiracy (Count 2)—along with Gayle Ingersoll and Roy Bradley—to cover up the illegal advances that he did not report as income:

> [t]he government anticipates presenting evidence that a significant part of the income that Steven Ingersoll failed to report on his 2009 (count 6) and 2010 (count 7) federal income tax returns was income he derived from advances he made to himself from funds belonging to the Grand Traverse Academy. In part motivated by the need to restore the deficiencies Steven Ingersoll created by making those advances to himself, Steven and Deborah Ingersoll engaged in the bank fraud conspiracy alleged in count 1 of the indictment.

---

[14] The Government contends that Steven Ingersoll's motivation for participating in the bank fraud conspiracy and tax fraud conspiracy was to cover up his misuse of funds from the Grand Traverse Bay Academy. The Government does not, however, explain why the other Defendants joined in the conspiracies.

- 12 -

Resp. 3, ECF No. 51.

Moreover, there is a temporal overlap among the charges.  The bank fraud conspiracy is alleged to have been conducted between April 2010 to June 2011, and the tax evasion conspiracy is alleged to have been conducted between April 2010 and October 2012.  Steven Ingersoll's alleged tax evasion, meanwhile, is alleged to have occurred in May 2010 (during the timeframe for both the bank fraud and tax evasion conspiracies) and between October 2011 and April 2012 (during the tax evasion conspiracy).  Resp. 4, ECF No. 51.

"In the decision of whether to join, the predominant consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction only be proved once."  *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987) (internal quotation omitted).  The Sixth Circuit has held that a group of acts or transactions constitutes a series if they "are logically interrelated and involve overlapping proof."  *Id*.  Here, the government asserts that evidence supporting Counts 6 and 7 against Steven Ingersoll may be admissible to explain acts in furtherance of the conspiracies to commit bank fraud and tax fraud—the central charges in the Superseding Indictment.  The Superseding Indictment charges all Defendants with conspiracy to commit bank fraud, and charges Steven Ingersoll, Gayle Ingersoll, and Roy Bradley, Sr., with conspiracy to commit tax fraud.  The Superseding Indictment further charges Steven Ingersoll with tax evasion regarding his attempt to disguise the money allegedly received from Grand Traverse Academy—which is also the motive for the bank fraud conspiracy and tax evasion conspiracy.  *See United States v. Hohn*, 293 F. App'x 395, 492 (6th Cir. 2008)); *see also United States v. Bibby*, 752 F.2d 1116, 1121 (6th Cir. 1985) ("[C]oncealment of ill-gotten gain is an integral part of assuring the success of that illegal activity.").  Joining the charges against Steven Ingersoll is in the interests of trial

economy, as both the tax fraud and the conspiracies were an attempt to cover up the income received from Grand Traverse Academy. Therefore, the charges against Steven Ingersoll only— Counts 6 and 7—were properly joined. Defendants' request for severance due to improper joinder will therefore be denied.

**B**

Defendants next argue that the Court should sever Counts 6 and 7 from the Superseding Indictment and trial due to the prejudice to them that will result from the spillover effect of Steven Ingersoll's tax evasion counts. *United States v. Najor*, 13-20462, 2014 WL 2608067 (E.D. Mich. June 11, 2014).

> Rule 14 of the Federal Rules of Criminal Procedure provides:
>
> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

"The standard for severance under Rule 14 is very stringent." *United States v. Norwood*, 2014 WL 2025131, at *9 (E.D. Mich. May 16, 2014). "This is particularly true in cases involving conspiracy or joint participation in a common scheme; where the charges are to be proven by the same evidence, resulting from the same series of acts, there is a strong policy in favor of joint trials." *United States v. Weiner*, 762 F. Supp. 712, 713 (E.D. Mich. 1991).

The Sixth Circuit has further stated that, even "where the risk of prejudice is high, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *Zafiro v. United States*, 506 U.S. 534, 534 (1993)). To that end, "[a] request for severance should be denied if a jury can properly compartmentalize the evidence as it relates to the appropriate defendants." *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987). The Sixth Circuit has advised:

a defendant is not entitled to a severance simply because the evidence against a
codefendant is far more damaging than the evidence against him . . . . [I]n a joint
trial, there is always a danger that the jury will convict on the basis of the
cumulative evidence rather than on the basis of evidence relating to each
defendant.  However, we adhere to the view, as previously stated by our court,
that the jury must be presumed capable of sorting out the evidence and
considering the case of each defendant separately.  The presentation of evidence
applicable to more than one defendant is simply a fact of life in multiple
defendant cases.

*Id*. at 1288 (quotation marks and citations omitted).  Even if there is a risk of prejudice, the

Supreme Court has indicated that "less drastic measures, such as limiting instructions, often will

suffice to cure any risk of prejudice."  *Zafiro*, 506 U.S. at 539.  The defendant seeking severance

bears the burden of demonstrating "substantial prejudice."  *United States v. Beverly*, 369 F.3d

516, 534 (6th Cir. 2004).

Defendants suggest that severance is necessary because the jury would be unable to

differentiate the charges against them from the additional charges against Steven Ingersoll:

[F]or if the jury has to muddle through a complex tax case related only to Dr.
Ingersoll, and hear evidence regarding the Chemical Bank transaction, there is a
likelihood of jury confusion conflating Dr. Ingersoll's unrelated tax case with all
other defendants, leading them to conclude that evidence of Dr. Ingersoll's
unrelated tax case nevertheless suggests all defendants are guilty.

Mot. for Severance ¶ 18, ECF No. 44.

Although it is true that the risk of prejudice is heightened where "defendants are tried

together in a complex case and they have markedly different degrees of culpability," *Zafiro*, 506

U.S. at 539, Defendants have not met their burden of showing specific and compelling prejudice

that would result from a joint trial.

First, as noted above, Defendants contend that the charges against Steven Ingersoll will

"spillover" and the jury could find them guilty by association with Steven Ingersoll's tax fraud

charges.  But courts in this district have repeatedly rejected the argument that "guilt by

association" is sufficient for severance. *See Norwood*, 2014 WL 2025131, at *11; *United States v. Neace*, 2008 WL 1735373, at *3 (E.D. Mich. Apr. 14, 2008) (denying severance where request was based on conclusory allegations of possible guilt by association). In addition, the Sixth Circuit has rejected Defendants' "jury confusion" argument: "Even when a defendant is able to show some potential for jury confusion, such confusion must be balanced against society's interest in speedy and efficient trials." *United States v. Walls*, 293 F.3d 959, 966-67 (6th Cir. 2002).

Here, Defendants have not shown that the evidence related to Counts 6 and 7 would so confuse the jury that it outweighs society's interest in speedy and efficient trials. That Defendants' co-defendant is charged with crimes related to tax fraud does not mean they will be prejudiced by any spillover effect; the jury is "presumed capable of sorting out the evidence applicable to each defendant and rendering its verdict accordingly." *United States v. Elder*, 90 F.3d 1110, 1120 (6th Cir. 1996).

Moreover, Defendants have not shown that the jury will be incapable of compartmentalizing the evidence against Steven Ingersoll only. The Government will be proving Counts 6 and 7 against Steven Ingersoll only. Even if the Government introduces evidence against Steven Ingersoll[15] and successfully proves Counts 6 and 7 against Steven Ingersoll, it does not follow that the jury will associate Steven Ingersoll's guilt on such Counts with Defendants. Significantly, not only do the allegations with respect to Counts 6 and 7

---

[15] *See United States v. Gallo*, 763 F.2d at 1525 ("Merely because inflammatory evidence is admitted against one defendant, not involving another codefendant (and with which the other is not charged), does not, in and of itself, show substantial prejudice in the latter's trial.").

specifically name only Steven Ingersoll, any jury instructions-and any questions on the jury verdict form-related to Counts 6 and 7 will identify only Steven Ingersoll.[16]

Therefore, Defendants have not shown that they will be prejudiced by Counts 6 and 7 being part of the Superseding Indictment and trial. *See Najor*, 2014 WL 2608067, at *11 (declining to sever tax and bankruptcy fraud counts in a bank-fraud conspiracy case because the defendants were neither improperly joined nor prejudiced by the joinder).

## IV

In the third motion, Steven Ingersoll, Deborah Ingersoll, and Gayle Ingersoll request that the government disclose the "identities of any Informants . . . ." Mot. to Produce Confidential Informants 8, ECF No. 45. They also seek an order requiring the Government to turn over any exculpatory material.

## A

The Government holds the privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *United States v. Sales*, 247 F. App'x 730, 734 (6th Cir. 2007) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). When the privilege is challenged, a court must weigh "the public interest in protecting the flow of information to the government" against "the defendant's need for disclosure of information in the preparation of a defense." *Id.* (quoting *United States v. Straughter*, 950 F.2d 1223, 1232 (6th Cir. 1991)). "Disclosure has usually been required where the informant was an active participant in the events underlying the defendant's potential criminal liability," however, "[d]isclosure has usually been denied where the informant was not a

---

[16] Indeed, where charges are compartmentalized, as here, a defendant may even benefit from being able to highlight his lesser role. *See United States v. Kilpatrick*, 2012 WL 3464698, at *4 (E.D. Mich. Aug. 14, 2012) (citing *United States v. Hutchinson*, 573 F.3d 1011, 1030 (10th Cir. 2009) (observing that "difference in culpability . . . might actually benefit [the defendant] by reinforcing his argument that he was just an 'errand boy,' not a conspirator").

participant, but a mere tipster or introducer." *United States v. Dexta*, 136 F. App'x 895, 905 (6th Cir. 2005) (internal citation omitted) (citing *United States v. Sharp*, 778 F.2d 1182, 1186 n.2 (6th Cir. 1985)).

Significantly, to prevail on this motion a defendant must demonstrate "how disclosure of the informant would substantively assist his defense"; a "simple statement" that disclosures regarding the informant "might assist in his defense" is insufficient. *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992)). The defendant has the burden to show how the informant is relevant and helpful to the defense, or essential to a fair trial. *See Roviaro*, 353 U.S. at 60-61; *Moore*, 954 F.2d at 381.

In this case, Defendants explain that Mr. Tim Hunnicutt[17] "played detective" and secretly recorded several of his conversations with other third-parties. They further explain that "based on the surreptitious way Hunnicutt made recordings of conversations with Dr. Ingersoll without government oversight, there is reason to believe other individuals were likewise consorting with Hunnicutt and feeding the government information in efforts to ruin Dr. Ingersoll personally." Mot. to Produce Confidential Informants 4.

Defendants contend that they are entitled to the names of any person that Hunnicutt may have surreptitiously recorded:

> [C]ooperating witnesses and/or any confidential informants participated in the alleged events surrounding Dr. and Mrs. Ingersoll's indictment. The identity of all such witnesses, however, is still unknown. Such witnesses are potentially exculpatory as to the Ingersoll's guilt, punishment or both.

---

[17] It is unclear from the record what Mr. Hunnicutt's relationship, if any, is to the Defendants. The only descriptive information provided is that Mr. Hunnicut has an associate's degree in criminal justice. Although Defendants claim that Mr. Hunnicut may be "a paid informant, cooperating witness, or private citizen with an axe to grind," it does not appear that Mr. Hunnicut is employed by any law enforcement agency. *See* Mot. Produce 4. It is also unclear why Mr. Hunnicut would have "an axe to grind." Steven Ingersoll makes general allegations that he has made "powerful and determined political enemies" that have "strong financial and political interests in undermining the charter schools," though, again, it is unclear if Mr. Hunnicut is one of these political enemies. *Id*. at 3.

Mot. to Produce Confidential Informants ¶ 12.  Moreover, they generally allege that "[t]he confidential informant(s) utilized in the case *likely discussed the alleged conduct* that led the government to indict Dr. Ingersoll."  *Id.* at 3 (emphasis added) (citing *McLawhorn v. State of North Carolina*, 484 F.2d 1, 5-6 (4th Cir. 1973)).

Absent from their brief, however, is an explanation for how the disclosure of these supposed informants would assist their defense.  Instead they make the "simple statement" that the informants "are potentially exculpatory".  *See Sharp*, 778 F.2d at 1187 ("Mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure.").

Moreover, Defendants impliedly concede that the supposed informants did not actively participate in the underlying events, a factor that would weigh heavily in favor of disclosure. *See Devose v. Norris*, 53 F.3d 201, 206-07 (8th Cir. 1995) (disclosure required because informant was an active participant in the drug transaction); *United States v. Price*, 783 F.2d 1132, 1139 (4th Cir. 1986 ) (disclosure required because informant was active participant in the deal).  Rather, Defendants allege that the informants "likely discussed the alleged conduct."  This allegation does not allege that the informants were active participants; instead, the alleged informants are more akin to "tipsters" who did not play a prominent role in the events underlying the indictment.  *See Dexta*, 136 F. App'x at 905.

Defendants have not met, at least at this juncture, their burden of showing that the disclosure of the alleged informants who spoke with Mr. Hunnicutt is essential to a fair trial. Defendants simply allege that these informants may have exculpatory information, which is insufficient to trigger disclosure.  In addition, Defendants have not alleged that informants were active participants in the underlying events, but rather that the informants may have discussed

- 19 -

the events.  That the alleged informants were akin to "tipsters" rather than active participants further weighs against disclosure.

Defendants have nonetheless requested that this Court conduct an in camera interview with the informant(s) so that the Court can determine the potential witnesses' necessity to the defense.  Mot. to Produce Confidential Informants 4.  However, there is no need to conduct an in camera interview where there is no suggestion that the informant did more than provide a tip regarding alleged conduct.  *See United States v. Hudson*, 325 F. App'x 423, 426 (6th Cir. 2009) (stating that an in camera hearing was not required when the informant merely furnished a tip to help police obtain a warrant); *cf. United States v. Eddings*, 478 F.2d 67, 71 (6th Cir. 1973) (where the informant was likely to have been an active participant in the criminal conduct, an in camera review was warranted).

At this stage, Defendants have not sufficiently alleged that the disclosure of the informants is necessary to ensure a fair trial.  Therefore, their motion to disclose the identity of any confidential informants will be denied.

However, at least one court has noted that requests for disclosure of informant identities are properly construed as a motion in limine.  *See United States v. Stone*, 2012 WL 113486, at *6 (E.D. Mich. Jan. 13, 2012).  And because a ruling on a motion in limine is preliminary, it is subject to change.  *See, e.g., United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994) ("A ruling on a motion in limine is no more than a preliminary, or advisory, opinion that falls entirely within the discretion of the district court. . . . However, the district court may change its ruling at trial for whatever reason it deems appropriate.").  If, for example, Defendants carry their burden of showing that the informants are necessary, the Court may require disclosures.

**B**

- 20 -

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and this Court's scheduling order (ECF No. 34), the Government is obligated to disclose exculpatory evidence to Defendants. In light of this obligation, Defendants now move to require disclosure of (1) Brady exculpatory material; (2) witness statements; (3) grand jury testimony; (4) law enforcement reports; and (5) "[a]ny material or information which affects the credibility of any" witness. Mot. to Produce Confidential Informants ¶ 15(b), (d).

In general, three governing rules, (i) the *Brady* doctrine, (ii) Federal Rule of Criminal Procedure 16, and (iii) the Jencks Act, 18 U.S.C. § 3500, "exhaust the universe of discovery to which the defendant is entitled." *United States v. Presser*, 844 F.2d 1275, 1285 n. 12 (6th Cir. 1988). Only the specific categories of evidence outlined in Rule 16 are required to be disclosed before trial.[18] *Id*. at 1284-85. Here, none of the requested disclosures fall within the strictures of Rule 16, and therefore they need not be disclosed before trial.

First, with respect to Defendants' general request for "exculpatory *Brady* material," the Government has an obligation to turn over *Brady* material according to the timeline set by the Jencks Act. However, "[t]he clear and consistent rule of this circuit is that the intent of Congress expressed in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial. *Presser*, 844 F.2d at 1283. And "so long as the defendant is given impeachment material, even exculpatory material, in time for use at trial," there is no constitutional violation. *Id*. at 1283.

---

[18] These categories include "any oral or written statements of the defendant, the defendant's prior record, any documents or tangible evidence within the government's possession, custody or control, reports of examinations or tests, and a summary of any expert witness testimony." *United States v. Pegross*, 2007 WL 1771542, at *1 (E.D. Mich. 2007) (citing Federal Rule of Criminal Procedure 16).

Moreover, where, as here, the Government has conceded that it is aware of its obligations under Rule 16, *Brady*, and *Giglio*,[19] compelling pre-trial discovery is not warranted. *United States v. Pegross*, 2007 WL 1771542, at *2 (E.D. Mich. 2007). This is because "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Presser*, 844 F.2d at 1281 (quoting *United States v. Bagley*, 473 U.S. 667, 675 (1985)). Defendants have not shown that disclosure at the current point in the litigation is necessary, and therefore this request will be denied.

Second, with respect to witness statements, the Jencks Act "generally requires the government, on a motion of a defendant, to produce statements in its possession of witnesses who testify at a trial." *United States v. Short*, 671 F.2d 178, 185 (6th Cir. 1982). The Government is thus only required to produce the statement after the witness has testified on direct examination. 18 U.S.C. § 3500(a); *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993) ("The Jencks Act . . . requires the government to supply the defense with any material statement made by the witness, *after the witness has testified at trial*.") (emphasis added). Thus, Defendants do not presently have a right to disclosure of witness statements, because no witness has yet testified at trial.

Third, with respect to grand jury testimony, Federal Rule of Criminal Procedure 16(a)(3) specifically excludes grand jury transcripts from the Government's pre-trial disclosure obligations: "This rule does not apply to the discovery or inspection of a grand jury's recorded proceedings . . . ." Instead, Rule 16(a)(3) places grand jury within the scope of Rule 26.2, which requires disclosure only after a witness has testified. *See also United States v. Martin*, 2008 WL

---

[19] *See Giglio v. United States*, 405 U.S. 150 (1972) (holding that evidence affecting witness reliability may be *Brady* material).

- 22 -

152900, at *7 (E.D. Tenn. Jan. 14, 2008) *aff'd*, 516 F. App'x 433 (6th Cir. 2013).  Accordingly, disclosure of a potential witness's grand jury testimony at this stage is not warranted.

Fourth, with respect to law enforcement reports and reports of the United States Attorney's Office or other agency, Federal Rule of Criminal Procedure 16(a)(2) similarly excludes these types of reports from the government's disclosure obligations:

> **Information Not Subject to Disclosure.** . . . [T]his rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

Again, Rule 16 places such information within the ambit of Rule 26.2, which requires disclosure only after an agent-witness testifies. *See also United States v. Hennings*, 2003 WL 2005492, at *2 (W.D. Tenn. Feb. 11, 2003).

Finally, with respect to the impeachment of potential government witnesses, Defendants maintain that the "denial of the requested pretrial disclosure would infringe upon principles of fundamental fairness and detract from the interests of judicial economy."  Mot. to Produce Confidential Informants 6.  Defendants note that "'*Brady* material' includes information bearing on the credibility of government witnesses," and therefore they "request the production or disclosure of all such information."  *Id*. at 5.

Where impeachment evidence of Government witnesses falls within the ambit of the Jencks Act and *Brady*, the information may be withheld until after the witness's testimony.  18 U.S.C. § 3500(b).  And, as noted above, "so long as the defendant is given impeachment material, even exculpatory material, in time for use at trial," there is no constitutional violation.  *Presser*, 844 F.2d at 1283.  Accordingly, Defendants do not have a right to government

disclosure of any of the impeachment evidence requested before the time set out by the Jencks Act.

## C

Although Defendants do not have a right to government disclosure of the *Brady* information at this point, this Court nonetheless has discretion to order advance disclosure of *Brady* material so as to avoid a constitutional violation. *See United States v. Hart*, 760 F. Supp. 653, 655 (E.D. Mich. 1991) ("Although . . . pretrial disclosure of *Brady* material is not required, it is clear that a district court has general authority to order pretrial disclosure of *Brady* material to ensure the effective administration of the criminal justice system.") (internal quotation marks omitted).

Advance disclosure of the alleged *Brady* material is not warranted here. Defendants have not offered any particularized reasons for requiring an earlier disclosure date for witnesses. At most, Defendants speak of a generalized need for information regarding possible defenses and for cross-examination. Thus, Defendants have not made a showing that their constitutional rights would be violated absent advance disclosure of *Brady* material.

## V

In the final motion under review, Steven Ingersoll and Gayle Ingersoll seek permission to file future evidentiary motions after the motion cut-off date set in the Scheduling Order. They note that, although they have filed all motions that are currently ripe for decision,

> It is the experience of Counsel that as trial approaches, trial strategy can evolve and previously unrecognized evidentiary or discovery issues may arise, especially as discovery is organized and prepared for trial.

Mot. for Leave to File ¶ 3, ECF No. 46. They therefore requests leave to file appropriate evidentiary motions after the cut-off.

- 24 -

Defendants' motion is limited to evidentiary challenges that will otherwise have to be addressed in trial so the deadline for these evidentiary challenges will be extended to November 3, 2014.  All motions in limine and motions to exclude evidence should be filed on or before that date.

## VI

Accordingly, it is **ORDERED** that Steven Ingersoll's Motion for Bill of Particulars (ECF No. 48) is **GRANTED**.

It is further **ORDERED** that the Government is **DIRECTED** to provide, within twenty-one days of entry of this Order, a bill of particulars as to Counts 6 and 7 of the Superseding Indictment that provides information regarding: (i) the specific method the Government intends to use to prove the charges; (ii) the computation and calculation of the specific items of income comprising Steven Ingersoll's actual taxable income and their source, and the deductions and costs allowed and disallowed against such income; (iii) the dates, amount, character, and source of the income allegedly received but not reported; and (iv) the specific entries or portions of the relevant tax returns that are allegedly false.

It is further **ORDERED** that Roy Bradley's, Deborah Ingersoll's, and Gayle Ingersoll's Motions to Sever Counts 6 and 7 due to Improper Joinder (ECF No. 44, 47, 49) are **DENIED**.

It is further **ORDERED** that Steven Ingersoll's, Deborah Ingersoll's, and Gayle Ingersoll's Motions to Produce Confidential Informants and Exculpatory Information (ECF No. 45, 49) are **DENIED**.

It is further **ORDERED** that Steven Ingersoll's and Gayle Ingersoll's Motions for Leave to File Future Evidentiary Motions (ECF No. 46, 49) are **GRANTED**.  Any Defendant may file evidentiary motions and motions in limine on or before **November 3, 2014**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 22, 2014

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 22, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

---