UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                Criminal No**.** 14-CR-20216

        v.                          Judge Thomas L. Ludington

D-1   STEVEN J. INGERSOLL,
D-4   ROY C. BRADLEY, SR.,

                Defendants.

_____/

GOVERNMENT'S SUPPLEMENTAL SENTENCING BRIEF
REGARDING STEVEN INGERSOLL

      As directed by the court, the government submits the following

supplemental brief.

1.    **Issues Related to Guideline Enhancements**

<u>The Grand Traverse Academy Was Victimized by Steven Ingersoll</u>

      Noting that the evidence on the question is conflicting, the court has directed

the parties to address the victimization of GTA for restitution purposes.  (R. 271:

HTr.[1] PgId 3866-67).[2]  Ingersoll's discussion of the issue fails to address the

_____

[1] HTr. refers to hearing transcripts; TTr. refers to trial transcripts.

[2] The Grand Traverse Academy was victimized by Steven Ingersoll, both for
purposes of the guideline assessment for abuse of a position of trust or use of a
special skill under USSG §3B1.3 and for purposes of restitution.  That guideline
issue has been separately briefed.  (R. 234: Government's Pre-Hearing Brief
Regarding USSG §3B1.3, PgId 2752-3152).

conflicting evidence and, instead, ignores evidence inconsistent with his position and engages in an irrelevant discussion of the statute of limitations on contract claims and equitable tolling.[3]  As framed by the court, the question "at this juncture is the propriety of entering a restitution order under the factual circumstance where there seems to be a legitimate question about when and under what circumstances, if any, that amount was to be repaid."  (*Id.*, at PgId 3866).

Ingersoll relies heavily on the testimony of Brad Habermehl, current president of the GTA board, to support his claim that GTA is not a victim. Habermehl's testimony that GTA is not a victim should not be credited, however. As discussed below, Habermehl's loyalties lie with Steven Ingersoll rather than GTA.  Moreover, the appropriate question is whether GTA, not the GTA board, is a victim in this case.

Ingersoll is Habermehl's long-time mentor.  The close association between the two dates back to at least 1984 when Ingersoll recommended Habermehl's admission to optometry school (see Habermehl's April 20, 2015 "character reference" letter to court) and continues to the present.  Habermehl even sought the support of other investors with himself, Bruce Harger of LSSU, and Ingersoll in yet another school project after Ingersoll had been convicted in the present case.

---

[3] Ingersoll does not provide any authority to support his implied contention that restitution in a federal criminal case is subject to state equitable tolling provisions or limitations on civil actions.

(R. 257-4 & 257-6: Attachment 575, Habermehl email dated March 15, 2015, last ¶, PgId 3355, & Attachment 577, Habermehl email exchange with potential investor and Ingersoll, dated November 24, 2014, PgId 3357; R. 154: S. Ingersoll Verdict form, PgId 1250-51).[4]  Habermehl lives and works in Genesee County rather than the Traverse City area,[5] and no child of his has attended GTA.  Yet, Ingersoll recruited Habermehl for the GTA board.  (R. 240: HTr., PgId 3195).

Habermehl was often inaccurate during his testimony.  Board minutes show that Habermehl became a GTA board member on October 5, 2012 (Def.Ex 1: Gta 00568), and president of the board on March 19, 2014 (Def.Ex 1: Gta 00752-53), yet he testified to different dates until he was lead to agree with more accurate dates by Ingersoll's counsel.  (R. 240: HTr., PgId 3194-95).[6]  Habermehl also

---

[4] When available, record citations will be provided in this brief.  Record citations are not available for attachments and exhibits filed with this brief, however.  When testimony has not been transcribed, the court can confirm the representations made in this brief by consulting its own notes and/or its court reporter.

[5] The distance between the two locations is approximately 180 miles.

[6] Habermehl did not become a board member until a half a year after Steven Ingersoll's brother was interviewed by federal agents.  That interview prompted Steven Ingersoll to hire defense attorneys for himself and for his brother, keeping the latter from cooperating with the investigation.  (See R. 234-23: Att. 548, June 6, 2012 letter from counsel for Gayle Ingersoll, PgId 3132;  R. 234-24: Att. 549, July 27, 2012 letter from counsel for Steven Ingersoll, PgId 3133).  Given the close friendship between Steven Ingersoll and Brad Habermehl, it is quite possible that Habermehl knew of his friend's problems with the IRS before Habermehl became a GTA board member and actually joined to board to assist Ingersoll.

3

testified inaccurately that he was a board member for five or six months before becoming board president. (*Id.*). What is important about Habermehl's actual tenure on the GTA board, however, is that Habermehl was not even associated with the GTA board when Ingersoll took millions of dollars from GTA. Habermehl's testimony regarding what the many different board members supposedly knew and understood about those millions of dollars in overpayments to Ingersoll in the many years before the investigation became known is simply beyond Habermehl's knowledge.

However, Kaye Mentley, the GTA school superintendent and an employee of Ingersoll's SSM, attended the GTA board meetings from the inception of the school until after the indictment of Ingersoll resulted in Ingersoll's SSM being terminated as the educational services provider for GTA.[7] Mentley, in contrast to Habermehl, declined to confidently testify as to the state of mind of the individual GTA board members who served on the board during the twelve years or so before Habermehl became a member.

Mentley's testimony revealed that she did not understand that GTA was actually in a deficit and Ingersoll was manipulating the books to conceal that fact. Unbeknownst to Mentley, Ingersoll habitually took from GTA all of the projected management fee shortly after the start of each fiscal year. When Ingersoll's use of

---

[7] Margo Abbott, an SSM employee called to testify by Ingersoll on October 21, 2015, described Mentley as the school's "visionary."

that practice created a year-end deficit for GTA, Ingersoll simply promised to pay money to GTA to make it appear on the school's books that it was solvent and then used GTA's own funds to create the appearance that the promised funds had actually been received by GTA in the following fiscal year. (*E.g.*, R. 263: Ingersoll HTr., PgId 3653). It was not until November of 2012, during a private meeting with Ingersoll, that Mentley learned that "SSM" owed GTA millions in what Ingersoll called "unmet receivables." (See also R. 234-30: Att. 555, Mentley affidavit, PgId 3145-52).

Mentley had reasons to be attentive to GTA's finances because the finances directly influenced her ability to achieve the things that she thought appropriate as school superintendent. Yet Mentley did not come to understand the financial "sleight of hand" repeatedly employed by Ingersoll from her frequent interactions with Ingersoll and her regular attendance at GTA board meetings, until very late in the relevant time period.

The GTA board members, who had only the board meetings and the fine print in inaccurate financial statements to inform them, had far less opportunity then Mentley to come to understand Ingersoll's manipulation of the GTA books to conceal his misuse of the financial resources provided by the public to the GTA students. There is little reason to believe that, over the years, all of the various GTA board members were fully informed of and yet complicit in Ingersoll's

5

manipulations of GTA's financial resources.[8]  Significantly, Ingersoll has not

directed the court's attention to a discussion in the GTA board minutes of the true

nature of the financial transactions now conceded by Ingersoll.  (See *e.g.*, R. 266:

Ingersoll colloquy with court, HTr., PgId 384748, 3849-50).

Habermehl's contention that GTA is not a victim may be consistent with his

personal opinion, biased by his long and close personal and business association

with Ingersoll, but that contention is not consistent with the evidence received from

far more objective sources.  For example, the forensic auditor observed that

Ingersoll's fee arrangement with GTA "provide[d] an opportunity for abuse."  (R.

234-3: Attachment 501, DGN Forensic Audit, PgId 2787).   The May 7, 2014

correspondence between the Michigan Department of Education and LSSU stated

that the pre-payment of management fees to SSM "may place the public school

academy in financial risk."  (Att. 523: Michigan Dept. of Education/Flanagan letter

to LSSU/McLain, attached).  The same letter outlined measures that LSSU could

---

[8] This is one of the many contradictory assertions made by Ingersoll:  If the GTA board was complicit in Ingersoll's deception, as suggested by Ingersoll and Habermehl's testimony, then the GTA board itself is criminally culpable for purposes of an upward role in the offense adjustment for Ingersoll under the sentencing guidelines.  If the GTA board was not complicit in Ingersoll's financial manipulations, then the GTA board, as well as GTA itself and the public, were victims of Ingersoll's abuse of the trust placed in him and Ingersoll's misuse of his special skills.  However, other than loyalty induced by the charismatic Ingersoll, no motive has been posited for the individual GTA board members to agree to be knowingly complicit in Ingersoll's deceptions and the resulting diversion of public funds that should have been used to benefit GTA.

require the GTA board serving at that time to adopt -- measures that would have prevented Ingersoll from manipulating GTA's finances to his own benefit. The fact that Habermehl construed the forensic audit and the letter from the Michigan Board of Education to bestow upon the GTA board "a silver stamp" and as indicators that the board was "squeaky clean" (R. 240: HTr., PgId 3186), indicates that Habermehl was far from a neutral and objective reader of the forensic audit report and the MDOE letter.

The objective facts also show that the long-time attorney for the GTA board, Doug Bishop, sent a demand letter to Ingersoll on June 13, 2013, seeking full repayment of the at least $3,548,319 in excess management fees taken from GTA by Ingersoll. (R. 234-9: Att. 507, Bishop demand letter, PgId 3011-12). Habermehl thereafter removed Bishop from the position of counsel for the GTA board. (R. 240: HTr., PgId 3189). Habermehl also led the GTA board to pass a resolution forgiving Ingersoll's indebtedness to GTA (Att. 519: GTA/Morgan let to LSSU/Dobias, August 1, 2014 with attachments marked Att. 520: Jan Geht letter to GTA board, July 8, 2014, draft settlement agreement (A), draft GTA board resolution (B). chart (C), Elliot resignation letter, Bishop substitution letter, attached), despite the absence of documentation in GTA's audited financial statements supporting Ingersoll's claim that the GTA board had agreed to pay him substantial off-setting funds.

7

In addition, it must be remembered that the students, parents and teachers of GTA, and GTA itself, are the victims deserving of restitution in this case, not the individuals who made-up the GTA board over the years of Ingersoll's abuse of GTA's finances. Habermehl's willingness to excuse Ingersoll's debt to GTA cost Habermehl nothing. The consequences of Habermehl's loyalty to Ingersoll were borne by those who had a real stake in the welfare of GTA. Thus, even if truly believed by Habermehl, his testimony that GTA is not a victim simply does not deserve to be accepted as fact by the court.

Finally, returning to the question raised by the court, clarity "about when and under what circumstances, if any, that amount was to be repaid" can be obtained by considering the annual GTA audits for the years before the federal investigation became known to Ingersoll. Those audits reveal that Ingersoll/SSM had committed to repay millions of dollars to GTA (though Ingersoll/SSM's identity as the obligor was concealed). No off-setting obligation from GTA to Ingersoll/SSM is reported in the annual audits in the years before the investigation became public. Likewise, no discussion of such an off-setting obligation is found in the GTA board minutes before the investigation became known. In fact, the claimed off-setting obligation supposedly from GTA to Ingersoll/SSM does not become a part of the available documents until the events that triggered the forensic audit occurred. In addition, the documentary information regarding the

claimed off-setting obligation from GTA is traceable in every instance to Ingersoll: Habermehl reluctantly acknowledged that the information regarding an off-set used in the "history" he manufactured and posted on the GTA website (Def.Ex. 13) was obtained from Ingersoll.  Similarly, Heidi Wendell, the forensic auditor from DGN, testified that she received the conflicting information regarding the claimed off-sets in Ingersoll's emails to her.  Ingersoll also testified that he had provided the (often conflicting) numbers regarding the various off-sets that he now claims. (*E.g.,* R. 263: HTr., PgId 3654-3693; R. 257-7: Att. 586, Chart with various earnings rebates and lease contributions claimed by Steven Ingersoll at different times, PgId 3358).

The credible evidence thus demonstrates that Ingersoll/SSM was obligated to repay millions of dollars to GTA each year during the time covered by the indictment and that GTA was not obligated to pay a set-off to Ingersoll/SSM.  The undisputed testimony of several CPAs (Wendell, Quimby, and even Henning) also establishes that, under the applicable government accounting principles, Ingersoll/SSM was obligated to pay the money owed to GTA within the first 60 days following the end of GTA's fiscal year.  In addition, the evidence, including Ingersoll's testimony (*E.g.*, R. 263: Ingersoll HTr., PgId 3653), shows that Ingersoll repeatedly negated his obligation to GTA during that 60 day period and also began to take funds from GTA's account once again.  As a result, Ingersoll

9

recreated a receivable obligation to GTA each year during the relevant timeframe. The receivable owed by Ingersoll/SSM to GTA when Ingersoll/SSM's educational service provider contract was terminated by GTA, not reduced by any claimed set-off from GTA, is the appropriate measure of restitution owed by Ingersoll to GTA. It appears to be undisputed that the amount of the final receivable owed by Ingersoll/SSM was $1.6 million.

Though the court indicated that it was interested in the factual, rather than legal, basis for finding that GTA was a victim for criminal restitution purposes, a brief comment on Ingersoll's legal argument that the only victim in this case is the IRS may be warranted.   Contrary to Ingersoll's claim, GTA is a victim for purposes of restitution.

Ingersoll's reliance on *Hughey v. United States*, 495 U.S. 411 (1990), and *United States v. Kilpatrick*, 798 F.3d 365 (6th Cir. 2015), to support his contention that GTA is not a victim, is misplaced.  In *Kilpatrick*, the Sixth Circuit merely held that the loss to the victim, and not the gain to the defendant, is the appropriate measure for restitution under 18 U.S.C. §3663A.  *Kilpatrick*, 798 F.3d at 388-91. In the present case, the applicable statute is 18 U.S.C. §3663, not §3663A, and no contention is made that restitution should be measured by Ingersoll's gain rather than GTA's loss.  Moreover, with regards to the current definition of victim in 18 U.S.C. §3663(a)(2), the Sixth Circuit held in *United States v. Jewett*, 978 F.2d 248,

10

253 (6th Cir. 1992):

> We interpret the amended section 3663(a)(2) as a change in the law,
> superseding the Supreme Court's decision in *Hughey*, adopting a
> broader definition of "victim," and expanding the scope of restitution
> which may be ordered for offenses involving "as an element a
> scheme, a conspiracy, or a pattern of criminal activity…[.]"

(*Id.*).  Thus, the narrower definition of victim in *Hughey* does not apply to

the current version of §3663(a)(2) or to Ingersoll's conspiracy conviction.

Some of the evidence presented at trial showed that, in the course of the tax

evasion conspiracy, Ingersoll orchestrated a series of financial transactions that

were motivated, at least in part, by Ingersoll's need to restore to GTA some of the

funds that he had diverted from GTA before GTA's fiscal year ended on June 30,

2011.  Evidence presented during Ingersoll's prolonged sentencing hearing reveals

that Ingersoll had diverted GTA funds to his grandiose but unsuccessful scheme

that included the renovation of a church into a school to establish the Bay City

Academy.  Ingersoll and his entities did not have sufficient funds to pursue that

project without tapping into the GTA funds that were accessible to and controlled

by Ingersoll as sole owner of Smart Schools Management (SSM), GTA's

educational service provider.[9]  Ingersoll and his co-defendants also sought to evade

the tax consequences of the financial transactions conducted in the course of the

conspiracy.

---

[9] See discussion of tax-related issues, below.

Thus, the evidence before the court supports the conclusion that as to count 2 of the indictment, which charged "an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," GTA was "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. §3663(a)(2). As such, GTA may be awarded restitution by the court.

### Ingersoll Abused A Position Of Trust And His Special Skill, Warranting An Enhancement Under USSG §3B1.3.

The propriety of imposing an enhancement under USSG §3B1.3 for Ingersoll's abuse of a position of trust and his use of a special skill has been briefed in some detail. (R. 234: Government's Pre-Hearing Brief Regarding USSG §3B1.3, PgId 2752-3152). Days of sentencing hearing evidence substantiate that position. The analysis in this brief regarding Ingersoll's victimization of GTA adds additional support for the assessment.

Viewed in its totality, the evidence reveals that for many years Ingersoll was entrusted with stewardship over millions of dollars of public funds that should have been used exclusively to educate the students of the Grand Traverse Academy and that he diverted millions of those dollars from that intended use to purposes that suited and benefitted Ingersoll. Ingersoll was able to do so, in part, because he was entrusted with control over the finances and books of GTA, which allowed Ingersoll to conceal his use of GTA's assets as if they were his own from those

charged with oversight on behalf of the school and the public. Ingersoll also was able to do so, in part, because he had the ability to inspire trust in him by the people he deceived and manipulated. Without that trust, and Ingersoll's abuse of it, Ingersoll simply could not have obtained the income on which he evaded his federal income tax obligations.

Ingersoll's Leadership Role in the Criminal Conspiracy Warrants A Four-Point Enhancement.

Steven Ingersoll's ability to direct others to engage in actions that serve his benefit has been manifested in a variety of ways:

The court is well aware of the three circuitous transactions orchestrated by Ingersoll involving $30,000, then $200,000, and also $704,000 transferred between Ingersoll's Madison Arts account, to accounts belonging to Tammy and Roy Bradley, to Gayle Ingersoll's accounts, and on to Steven Ingersoll and Deborah Ingersoll's personal bank accounts. The court is also aware of the evidence presented at trial of the transactions conducted by Deborah Ingersoll, including structured cash deposits and moving money through an account in her own name.

The attorney for Gayle Ingersoll acknowledged that there was no economic purpose to the transactions that went through Gayle Ingersoll's accounts. (R. 103: Gayle Ingersoll Trial Memorandum, PgId 709). Tammy Bradley told her brother, Roy Richard, that the series of $200,000 transactions were effectuated because Steven Ingersoll wanted to get back the $200, 000 paid to buy the church that was

13

converted into the Bay City Academy.  Tammy Bradley has told the court that she did what she was asked to do, without asking questions.  (*E.g.,* R. 100:  Tammy Bradley's Trial Memorandum, PgId 694).[10]

It is reasonable to infer that Steven Ingersoll was the person who set the transactions in motion since he was the ultimate financial beneficiary of each transaction.  Tammy Bradley reluctantly acknowledged during her testimony at Ingersoll's sentencing hearing that almost all of the Bradleys' income came from Ingersoll and his entities.  Tammy and Roy Bradley's willingness to give Ingersoll a kickback of almost a million dollars of the money paid to them for the work performed by their company on Steven Ingersoll's projects is compelling evidence of the management authority exercised by Ingersoll as part of the conspiracy.  In addition, Steven Ingersoll told Kaye Mentley, after the construction loan for BCA was approved, that the "seed money" that GTA had  provided to BCA could be returned.[11]

---

[10] Tammy Bradley declined to answer the questions put to her regarding who instructed her to engage in those transactions and what was said to her as to why she should perform her part, during her testimony at the Ingersoll sentencing hearing.

[11] Ingersoll paid at least some of the expenses associated with the establishment of BCA out of GTA's funds.  (Att. 529: Schrock affidavit, attached).  Ingersoll's use of GTA funds for the benefit of BCA, even if temporarily, was illegal.  (R. 234-14: Att. 515, Burkhart affidavit, ¶6, PgId 3106; R. 234-15: Att. 516, Hanrahan affidavit, ¶3, PgId 3107; R. 234-16: Att. 517, Rader affidavit, ¶6, 11, PgId 3110-11; R. 234-17: Att. 518, Clawson affidavit, ¶15, PgId 3117-18).

The totality of the evidence before the court demonstrates that Ingersoll was able to effectuate the transactions that contributed to him having substantial unreported income in 2011, as well as 2009 and 2010, because he controlled the GTA accounts and books.  Ingersoll was able to conceal those transactions because he employed and directed the actions of his staff members, Margo Abbott, Heidi Weber, and Stacey Young, as well as CPA Anthony Henning.  (Att. 512: TTr.,Young excerpt, attached; R. 234-11: Att. 509, Henning grand jury, Bates 2052, PgId 3052).  Ingersoll has even convinced counsel for the GTA board that it was in the interest of GTA[12] to forgive Ingersoll's theft of millions of taxpayer dollars intended for the use and benefit of GTA students.  (Att. 519: GTA/Morgan letter to LSSU/Dobias, August 1, 2014; Att. 520: Jan Geht letter to GTA school board, July 8, 2014, with draft settlement agreement (A), draft GTA  board resolution (B), attached).[13]

In further support of the government's contention that Steven Ingersoll should be assessed 4 points for his leadership role in the conspiracy, the

---

[12] Counsel for the GTA board reasonably may also have harbored fears of potential criminal culpability for the GTA board members.

[13]  Ingersoll's debt forgiveness plan for himself, though in the form of a settlement proposal to GTA, was rejected by LSSU.  (Att. 521: LSSU/Dobias letter to GTA board, August 18, 2014, attached; R. 234-18: Att. 522, Nicholas Oshelski affidavit, ¶6-7, PgId 3120-21; R. 234-17: Att. 518, Clawson affidavit, ¶¶11, 13, PgId 3115-17).

15

government has presented the testimony of IRS-CI Special Agent Nicholas Russo

regarding transactions with CS Computing.  The documentary evidence shows that

Roy and Tammy Bradley paid $46,000 to CS Computing for work to be done on

the BCA school renovation project and deducted that expense on their taxes.  (Att.

526: Thunder Builder's check to CS Computing; Trial exhibit 124: Thunder

Builder Vendor Balance Summary, attached).   However, when CS Computing

subsequently had reason to return the bulk of that money, $43,378, they made the

check to SSB, one of Steven Ingersoll's solely owned entities – not the Bradleys –

as Ingersoll directed.  (Att. 527: CS Computing check to SSB and deposit slip,

attached).  The day after Ingersoll deposited that check into the SSB account, he

moved $23,029.89 into a payroll account and $20,000 into his bank account for

SSI.  (Att. 528:  Bank statement for SSB account; Trial exhibit 231 J: Bank

statement for SSI account, attached).  The following day, Ingersoll transferred

$20,000 from the SSI account to one of his personal accounts.  (Trial exhibit 247 J:

Bank statement for Steven and Deborah Ingersoll account, attached.  See also Att.

525: Russo affidavit and additional exhibits referenced in the affidavit, Trial

exhibits 235 G and 270 F-1, Madison Arts bank statement and wire transfer record

reflecting transfer of $200,000 from Madison Arts to Thunder Builders; Trial

exhibits 235 G-1 and 270 F-3: Checks from Ingersoll to Roy Bradley totaling

$275,000; Trial exhibit 270 F: Thunder Builders credit union statement reflection

16

deposit of wire transfer and $100,000 check from Ingersoll, payment of $46,000

check to CS Computing, attached). This series of transactions demonstrate, once

again, Ingersoll's ability to direct others to engage in financial transactions that

benefitted Ingersoll and his entities over the interests of others, such as Roy and

Tammy Bradley, who were economically dependent on Ingersoll.

There is reason to believe that Ingersoll induced Roy and Tammy Bradley to

become involved in Ingersoll's acquisition of real estate, too. For example, on

April 29, 2011, Roy Bradley took an interest in a piece of real estate in Bay City

via a warranty deed. (Att. 601: Warranty deed to Roy Bradley, attached). On

February 28, 2012, Roy and Tammy Bradley quitclaimed their interests in the

same property to Farragut Schoolhouse LLC, one of Ingersoll's many solely

owned entities. (Att. 600: Quit Claim deed from Roy and Tammy Bradley to

Farragut Schoolhouse LLC, attached; Att. 602: LARA listing for Farragut

Schoolhouse LLC, Steven Ingersoll, agent, attached). Such manifestations of

coordinated, conspiratorial actions organized by Ingersoll seem to be limitless.

An additional manifestation of Ingersoll's leadership and control warrants

serious consideration by the court: Ingersoll also orchestrated the actions of others

in his effort to avoid being found guilty of the crimes charged in the indictment

against him. Ingersoll, in large measure, sought to take control of Roy Bradley's

defense in a related criminal case involving illegal asbestos removal during the

renovation of a church into the Bay City Academy building.  Roy Bradley's

attorney in the asbestos case described Ingersoll's conduct:

> Each time that I met with Mr. Bradley at his home, there would
> be Steve Ingersoll, Mr. Bradley, occasionally Jerry Essex [Bradley's
> co-defendant in the asbestos case], on one or two occasions Gayle
> Ingersoll.  Steve Ingersoll was dictating, orchestrating or directing, if
> you will, the defense.  He was even attempting to convince me to
> introduce evidence into trial that was not consistent with the rules of
> evidence.
> …
>
> It became apparent to me that I was not representing Roy
> Bradley, that I was probably representing more than anybody else, in
> some form or fashion, Steve Ingersoll[.]

(Att. 513: Escobedo testimony excerpt, PgId 641-42, attached).  The court found

that Steven Ingersoll, Gayle Ingersoll, Roy Bradley, Tammy Bradley (all co-

defendants in the present case), joined by Kristy Bradley (Roy and Tammy

Bradley's daughter), engaged in conduct resulting in the intimidation of

government witness which, in turn, warranted a bond modification for those co-

defendants.  (R. 109: Order, PgId 730-72.  See also Att. 513: Escobedo testimony

excerpt, PgId 614, attached).  The court also observed that Steven Ingersoll was an

unindicted co-defendant in the asbestos case at one point during Roy Bradley's

trial on those charges.

Kristi Bradley's involvement with Ingersoll and his schemes was not limited

to preparing trial subpoenas, however.  She also improperly notarized and served

as a witness on a quit claim deed transferring real property from Steven Ingersoll

to Gerald Essex, supposedly in exchange for $25,000 and "other valuable

consideration" approximately a month after Roy Bradley and Gerald Essex were

indicted together in the asbestos case.  (Att. 544: Quit claim deed witnessed and

notarized by Kristy Bradley, attached).[14]  Essex' ability to actually pay the recited

consideration is questionable, since his request for appointed counsel was granted

based on his lack of financial resources and his only known income stream at that

time was the very modest cash wages he received under the table from Roy and

Tammy Bradley for working on Ingersoll's projects.

In short, Ingersoll undertook effective measures to dissuade Roy Bradley

and Gerald Essex from cooperating with the government or accepting the

government's plea offers.  Ingersoll also organized and led the witness intimidation

efforts during the Bradley and Essex asbestos trial, recognizing that his financial

empire could continue if he successfully demonstrated to his co-conspirators that

he would assist them in avoiding responsibility for their crimes.

Similarly, on March 26, 2015, just a couple of weeks after he was convicted

by a jury, Ingersoll transferred his interest in another piece of real estate to Kyle

---

[14] Kristi Bradley improperly notarized her father's signature on a written, sworn
statement submitted to Chemical Bank by Steven Ingersoll and Roy Bradley to
obtain the first draw on the construction loan for the BCA renovation project.
(Trial exhibit 324,326: Roy Bradley sworn statement, February 1, 2011, attached).
Kristy Bradley also notarized a deed from Steven and Deborah Ingersoll to her
father on February 7, 2012.  (Att. 546: Quit claim deed to Roy Bradley from
Steven and Deborah Ingersoll, attached).

Andrezjewski.  (Att. 545: Quit claim to Andrezjewski, attached).  Andrezjewski was an employee of Roy Bradley and a person that the government repeatedly but unsuccessfully sought to serve with a subpoena to testify at trial.  The address for Andrezjewski on the deed from Ingersoll is for a place owned by Steven Ingersoll.  (Ingersoll PSR, p. 13).  It is also where Gayle Ingersoll testified that he lived during the trial.  The deed from Steven Ingersoll to Andrezjewski was notarized by Kristy Bradley, using her married name, Kristy Wyson.  (Att. 545: Quit claim to Andrezjewski, attached).  The implication from these facts is that Ingersoll rewarded Andrezjewski for not testifying at trial, just as Ingersoll rewarded Gerald Essex regarding the asbestos trial.

In sum, Ingersoll's ability to recruit participants in all of his complex schemes demonstrates his leadership position in his organization consistent with a 4-point role assessment under USSG §3B1.1(a).

Ingersoll Used Sophisticated Means To Commit His Offenses.

Contrary to the claims made by Ingersoll, the court has before it evidence that Ingersoll used sophisticated means to commit his offenses.  That evidence includes the fact that Ingersoll used over 30 financial accounts that are known to the government, yet not all of the accounts controlled by Ingersoll have been discovered by persistent and dedicated federal investigators.  The known bank records reveal that Ingersoll transferred funds repeatedly between accounts

20

controlled by him in what may fairly be described as "shell game" fashion.

Ingersoll also has created over 20 known, solely owned LLCs for his Bay County, Michigan interests alone.[15]  Michigan's records regarding LLCs cannot be searched by using Ingersoll's name as a search term, making it very easy for Ingersoll to conceal his interests in additional LLCs and very difficult for his interests in those LLCs to be discovered by the federal government.  How many additional LLCs he has established in other states, if any, is also unknown.  It also is unknown to the government how many of Ingersoll's LLCs are simply corporate shells with no assets and how many have currently undisclosed assets, including financial accounts, that are subject to Ingersoll's exclusive control.  Everything that is known about Ingersoll's assets and financial transactions gives reason to believe that, like an iceberg, more remains hidden then has been exposed to view by an extensive and thorough investigation.

The court is also aware of the circuitous financial transactions that Ingersoll repeatedly orchestrated and of Ingersoll's manipulation of the accounting of GTA's assets and expenses.  The court likewise is aware of multiple sets of QuickBooks made and maintained by Ingersoll.  (Trial Ex. 193D: QuickBooks).

With regards to the circuitous transactions which totaled $934,000, Ingersoll blithely claims that Roy Bradley "rebated" those funds to him.  (R. 273: Ingersoll

---

[15] The 20+ figure does not include any interests Ingersoll has in optometric and IVO clinics, nor his real estate interests elsewhere in Michigan.

Supplemental Brief Regarding Sentencing Issues, PgId 3887).  Ingersoll provides

no explanation as to what motivated Bradley to "rebate" to Ingersoll close to a

million dollars of the money that Bradley had earned working on Ingersoll's

projects, including but not limited to the conversion of the church to a school.

Tammy Bradley failed to cast any light on that matter when she testified.  Gayle

Ingersoll likewise could not explain during his testimony why he transferred to

Steven Ingersoll the $200,000 that supposedly was initially intended to be used to

install geothermal equipment, rather than return the money to Roy Bradley as the

prime contractor, when that part of the school renovation project was abandoned.

It also makes no sense that Gayle Ingersoll would be involved in the $30,000

transaction if that money was for the legitimate purpose of effectuating a real estate

deal between Roy and Steven Ingersoll.  (*Id*., PgId 3884, n. 4).  Gayle's

involvement in that transaction only extended the time that it took for the funds to

become available to Steven Ingersoll because the check issued to Gayle Ingersoll

by Roy Bradley had to clear Gayle Ingersoll's frequently overdrawn personal bank

account before Gayle Ingersoll's check to Steven Ingersoll would be honored.

Similarly, Gayle Ingersoll's explanation for his involvement in the

supposedly urgent $704,000 wire transfers on June 30, 2011 is illogical.  Gayle

Ingersoll testified that he did not trust Tammy Bradley with Steven Ingersoll's

account information.  Accordingly, Gayle Ingersoll gave Tammy Bradly his own

account information so he could receive the wire transfer on behalf of his brother.

Tammy Bradley testified that she and Roy Bradley had never given Gayle

Ingersoll cause to distrust them.

Tammy Bradley could have been instructed to wire the money back to

Steven Ingersoll's Madison Arts account, from which the money had been sent to

the Bradleys' business account.  That would have allowed Steven Ingersoll to then

transfer the money from his Madison Arts account to any one of his other accounts

and on to the GTA account.  Tammy Bradley previously had received wire

transfers from the Madison Arts account and checks drawn on the Madison Arts

account.  The information needed to wire the $704,000 back to the Madison Arts

account had been made available to her as a result.  No legitimate reason for

involving Gayle Ingersoll in this or other the other two transactions that

contributed to the $934,000 total has been provided over the course of the trial or

multiple days of Steven Ingersoll's sentencing hearing.

Steven Ingersoll's use of multiple sets of QuickBooks is a matter that has

taken yet another interesting twist.  In rather astounding fashion, Ingersoll now

seeks to negate the fact that he maintained multiple QuickBooks versions of his

finances by claiming that Matthew Baker erased all of the historical data in the

QuickBooks for SSM on January 1, 2012.  Ingersoll has not presented any

evidence to support that assertion.  In contrast, Baker testified during Ingersoll's

trial that he asked Ingersoll for accountant versions of Ingersoll's QuickBooks but that he did not receive those records.  Instead, Ingersoll mostly gave Baker summaries and profit and loss statements as selected by Ingersoll.  (R.149: TTr., PgId 1211-13, 1218).

It is also noteworthy, for purposes of both sophisticated means and obstruction of justice analysis (see below), that Ingersoll only made Baker aware of four of his business interests.  (*Id*., PgId 1212).  Ingersoll failed to provide information regarding his many additional business interests to the preparer of his 2010 tax returns.

Ingersoll's use of all of these devices amply support an assessment for his use of sophisticated means under USSG §2T1.1(b)(2).

Ingersoll's Solvency As Of August 10, 2010.

The court directed the parties to address Steven Ingersoll's solvency as of August 10, 2010, the date of Ingersoll's Chemical Bank construction loan application.  Ingersoll's supplemental brief failed to address this issue.  This omission is telling, for no one has better information regarding Steven Ingersoll's financial situation then Ingersoll himself.  Ingersoll's testimony casts some light on the question, however.

Ingersoll essentially acknowledged that he took money from where ever he could find it and moved it to where ever he needed, at will:

24

> When $30,000 was needed for this or that, I looked in my accounts
> online in the bank and just found the money where it was and spent it
> on the project, figuring I'd clean it up once I got my accounting in
> order. That's what I did. I rifled through the seat cushions essentially
> to get the money to do the things that I needed to do.

(R. 266: HTr., PgId 3831). Ingersoll further explained:

> This is now '10 moving up to – and then in '11, March through June, I
> utilized the line of credit at Traverse City State Bank and relied on the
> return from the construction line of credit and then used the return
> from the construction line of credit to – to the original purpose of the
> line of credit, which was support of GTA.

(*Id.*).

The situation described by Ingersoll during his testimony contrasts with the

financial picture he presented to Chemical Bank and the U.S. Department of

Agriculture to secure the construction loan for the BCA church-to-school

renovation project. In fact, when he testified at his sentencing hearing, Ingersoll

appeared to admit that he did not tell Chemical Bank or the USDA that he then

owed $3.5 million to GTA, though he realized that that obligation would adversely

affect his net worth. (R. 266: HTr., PgId 3834-35).

As discussed below, there are compelling reasons to find that Ingersoll

testified falsely when he claimed that the seed money for his BCA project came

from the TCSB line of credit rather than from GTA funds. Nevertheless, the

evidence before the court reveals that Ingersoll could not look to his own assets or

those of his entities to fund his grandiose BCA project, so he merely took the

25

money he wanted from the place where he could find it – in the GTA accounts he controlled.  Ingersoll lacked the financial solvency required to fund the BCA project.

Ingersoll Has Attempted To Obstruct Justice.

Though the court did not direct supplemental briefing on the issue of Ingersoll's obstruction of justice, that issue should not be forgotten.  Ingersoll has attempted to obstruct justice in multiple ways, warranting two separate assessments for discrete attempts at obstruction.  *United States v.Vaught*, 133 F. Appx. 229, 235 (6th Cir. 2005) (Holding that multiple assessments for obstruction of justice may be imposed in cases where the objectives of the obstructive behaviors differ); *United States v. Wilson*, 2015 WL 6685346, *7 (6th Cir. November 3, 2015) (same).

First, as discussed in Steve Ingersoll's PSR on page 9, paragraphs 36 and 37, and in the government's brief in opposition to his Rule 29/Rule 33 motions (R. 199 at PgId 2278-82), Ingersoll should be assessed two points for obstruction of justice under USSG §3C1.1 for misleading conduct that he engaged in and caused to be committed during trial.

In sum, Ingersoll contrived to present evidence to the jury that falsely suggested that there was an innocent explanation for the fact that he kept multiple and different sets of books for the entities that he used to obtain and conceal

unreported taxable income.  Ingersoll intended to influence the jury in a manner

favorable to him with that misleading evidence.  Therefore, Ingersoll's guideline

scoring in his PSR should include a two-point obstruction of justice assessment for

that conduct.

Second, Ingersoll has on multiple occasions presented false information to

the court, attempting thereby to favorably influence the court's sentencing-related

decisions.  Because these separate acts of attempted obstruction are aimed at

influencing the court's sentencing decisions, they are distinct from the obstructive

conduct that Ingersoll engaged in and caused during the trial. Ingersoll's

sentencing-related obstructive behavior can be scored separately from the conduct

that Ingersoll caused to be committed at trial.

The most egregious example of Ingersoll's sentencing-related obstructive

behavior is the false testimony he provided to the court.  One example of his

materially false testimony can be discerned in his attempt to convince the court that

the money needed to start the BCA project came from the Traverse City State

Bank line of credit account rather than from GTA.  As part of his sentencing

hearing testimony, Ingersoll stated:

> During the construction of Grand Traverse Academy – or of Bay City
> – of the Madison Arts project, I needed to put money into that project
> in order to get reimbursement from the bank.  I needed sources for
> that money.  I used my line of credit at Traverse City State Bank.  If
> you look at the bank statement at Traverse City State Bank the – I had
> a million dollars available.  I drew $756,000 from that line of credit

> from March of '11 to June of '11.  I sent $752,000 of that to Roy
> Bradley and the bank finally blessed the work that was done.
> …
>
> I drew money off that line of credit and moved it from Smart Schools
> to me, to other LLCs that were involved in the effort to get Bay City
> done.

(R. 266: HTr., PgId 3779-80).   Ingersoll also indicated that TCSB was aware of

and agreeable to his use of draws against the TCSB line of credit to fund the BCA

project and that an email exchange with Dan Stahl at TCSB documented that

understanding.  (*Id.*, PgId 3832-33).

However, Agent Russo testified that he reviewed the bank records in the

wake of Ingersoll's testimony and found that approximately $120,000 from the

TCSB line of credit account went to the BCA project via one of Ingersoll's

personal accounts, which is well less than the $752,000 now claimed by Ingersoll.

In addition, in an email dated January 17, 2013, Dan Stahl expressed concern to

Ingersoll about the possible use of the TCSB line of credit funds for purposes other

than the benefit of GTA.  (Att. 605: Email exchange between Steven Ingersoll and

Dan Stahl of TCSB, attached).  Ingersoll responded with an email that same day.

As part of his response, Ingersoll told Stahl, "The funds from the LOC were

always used for GTA cashflow[,]" and added, "TCSB LOC funds were not used

for BCA purposes[.]"  (*Id.*)

Thus, Ingersoll's sentencing hearing testimony regarding the source of the

seed money for the BCA project conflicts with Ingersoll's statement to Kaye
Mentley after the Chemical Bank construction loan was approved regarding BCA
returning seed money to GTA and with Ingersoll's emailed statements to Dan Stahl
of TCSB in January of 2013.  Both of those statements were made before Ingersoll
was indicted.   Ingersoll's testimony regarding the source of the seed money for
BCA also conflicts with the objective bank records reviewed by Agent Russo.

The most reasonable explanation for the conflict between Ingersoll's past
statements and his financial records, and his current testimony, is that Ingersoll's
testimony at his sentencing hearing is false.   Ingersoll knows, and probably
recognizes, that the evidence indicates that he did not have resources of his own to
start the BCA project.  He also recognizes the potential adverse consequence to his
sentence if the court finds   that he obtained the seed money for the BCA project
from GTA.  Ingersoll therefore has testified falsely that $752,000 of the BCA seed
money came from the TCSB line of credit account.

In addition, as discussed above in the context of the sophisticated means
enhancement, Ingersoll has provided yet another untenable explanation for his
creation of multiple sets of QuickBooks.  Ingersoll's alternative explanation for his
creation of multiple books falsely places the blame on Matthew Baker, tax preparer
once used by Ingersoll.  More important, this explanation is intended to influence
Ingersoll's sentence rather than the outcome of the trial.

Alternatively, for the reasons discussed in the government's motion asking the court to require Steven Ingersoll to provide complete and accurate information to his probation officer (R. 200 at PgId 2343-50), Ingersoll should be assessed two additional points for obstruction of justice under USSG §3C1.1.  Even at this juncture, it is impossible to accurately assess Ingersoll's current financial condition.  In fact, Steven Ingersoll has so successfully concealed the truth about his finances -- even from himself and his counsel -- that Ingersoll could not address the question of his solvency on August 10, 2010.

Accordingly, Ingersoll's guideline scoring in his PSR should include a second obstruction of justice assessment for his more recent and separate attempts at obstructing justice with regards to his sentence.

## 2.    Tax-Related Issues

<u>The Transactions Totaling $934,000 Are Taxable To Roy Bradley, Gayle Ingersoll And Steven Ingersoll.</u>

At trial and during sentencing, the government produced evidence of three circuitous financial transactions totaling $934,000 that passed from Madison Arts, LLC, to Roy Bradley's construction company, to Gayle Ingersoll and then to Steven Ingersoll.  All of the transactions are taxable except the initial disbursement of loan proceeds from Chemical Bank to Madison Arts, LLC.

First, the payment from Madison Arts to Roy Bradly's construction company is taxable because it is income which the construction company received

30

based on its construction contract.  (Trial Ex. 11).  In total, Roy Bradley's construction company was entitled to payment of $2.6 million for work on the Madison Arts project, and the payment of $934,000 represents a portion of that payment.  Because Roy Bradley's company had an unrestricted right to the $934,000, the funds paid to him are income.  Even though the construction company did not keep the funds, Roy Bradley cannot invoke the claim of right doctrine here because he had an unrestricted right to the funds.  *See Culley v. United States*, 222 F.3d 1331 at 1335-36 (5th Cir. 2000) (individual who had participated in a kickback scheme could not invoke the claim-of-right doctrine.)

Moreover, Roy Bradley actually claimed that at a least portion of the $934,000 was taxable to him when he filed his amended return.  (Trial Ex. 123B). The government calculated the gross receipts of Roy Bradley's construction company to be approximately $3.029 million—all from Ingersoll and his entities. If you reduce this amount by $934,000, the total is 2.095 million, which is less than the 2.4 million that Bradley reported as gross receipts on Schedule C of his amended return.  (Trial Ex. 123B).

Similarly, Gayle Ingersoll claimed the entire $934,000 as revenue on Schedule C of his 2011 tax return.  (Trial Ex. 131).  He falsely offset that amount with a fraudulent expense for payments to sub-contractors.  Because Gayle Ingersoll claimed the $934,000 as income, the government has included that figure

31

in Steven Ingersoll's tax loss.  The principal adjustment that the government is making to Gayle Ingersoll's return is to disallow the false expense for payment to subcontractors.

Finally, the $934,000 is taxable to Ingersoll because he received the funds as a kickback from Roy Bradley.  Ingersoll claims that the funds were a return of investment in Madison Arts, or alternatively, that they were merely loan proceeds that he was obligated to repay to Chemical Bank—as opposed to a kickback from Roy Bradley.  The circuitous route that the funds travelled, along with the jury's verdict, support the government's contention.

<u>The Taxes Owed By Gayle Ingersoll And Roy Bradley Are Properly Calculated
And Included In The Loss Calculations for Steven Ingersoll</u>.

Steven Ingersoll further claims that he should not be held accountable for the tax losses caused by his co-conspirators because the losses pertaining to Gayle Ingersoll and Roy Bradley were not reasonably foreseeable.  For the tax loss to be reasonably foreseeable, it is not necessary for the government to show that the co-conspirators "walked arm-in-arm with" with one another regarding their "omissions and crimes."  It is sufficient to show that the co-conspirators worked closely together and were compatriots in the scheme.  *See United States v. Schroeder*, No. 3:08CR-119-S, 2011 WL 1113373, at *2 (W.D. Ky. Mar. 25, 2011) (affirmed by *United States v. Schroeder*, 500 F. App'x 426, 438 (6th Cir. 2012)).

Here, the credible testimony demonstrates that Steven Ingersoll worked

closely with Roy Bradley with regards to the construction project. Ingersoll was aware that Bradley paid workers in cash and he orchestrated the financial transactions regarding the $934,000. Additionally, workers at the construction site testified at trial that they observed Steven Ingersoll at the construction site, and observed him receiving cash in a bank bag from Roy Bradley.

Steven Ingersoll had Roy Bradley hire his brother, Gayle Ingersoll to work at the construction site. Based on Steven and Gayle's familial relationship, the fact that they were mutually involved in the same project, and the fact that Steven was often present at the construction site, it is reasonable to conclude that Steven Ingersoll would have been aware of the fact that Roy Bradley was paying workers—including Gayle Ingersoll—in cash without providing W-2s or 1099s. Moreover, during 2011, Gayle Ingersoll received cash payments from Steven Ingersoll totaling $12,375. Gayle Ingersoll did not include a W-2 or 1099 on his 2011 tax return for those payments, and he did not otherwise report that income from his brother, because Steven Ingersoll, like Roy and Tammy Bradley, also did not provide a W-2 or a Form 1099 to Gayle Ingersoll.

Additionally, Gayle Ingersoll testified during sentencing that with respect to the three circuitous transfers totally $934,000, Steven Ingersoll directed all of those transfers. Tammy Bradley testified at sentencing that the only reason that she wired $704,000 to Gayle Ingersoll's account is because Gayle told her that Steven

33

wanted her to make the transfer. Tammy Bradley testified that she would not have wired such a large sum to Gayle's account had it not been at Steven's direction. The route that the funds travelled supports a strong inference that Steven Ingersoll wanted to disguise the transactions. It is certainly foreseeable, therefore, that the transactions would not be accurately reported on the co-conspirator's tax returns.

Based on all of the above, it was reasonably foreseeable to Steven Ingersoll that Roy Bradley and Gayle Ingersoll would not properly report the $934,000; that Roy Bradley would not accurately report and pay tax on other income that he received from the Bay City Academy Project; that Gayle Ingersoll would not properly report the $12,375 that he received in cash from Steven Ingersoll; and that Roy Bradley would not withhold the payroll taxes from the workers at the construction site.

Penalties and Interest Are Properly Included In The Loss Calculations On Count 2.

Ingersoll argues that he should not be subject to interest and penalties on the tax loss from 2011 which stem from his conviction for the Klein conspiracy, 18 U.S.C. § 371. Ingersoll argues that interest and penalties are included for evasion of payment cases under 26 U.S.C. §7201. (USSG § 2T1.1 cmt. n.1). He claims that because the tax loss from 2011 relates to his conviction under the *Klein* conspiracy, the interest and penalties should not be included. (R. 273, Def. Br., PgId 3885-86). Ingersoll is wrong, however, because interest and penalties should

34

be included where evasion of payment is part of the relevant conduct to the offense. *See United States v. Lombardo*, 582 F. App'x 601, 619-20 (6th Cir. 2014). There, Lombardo's co-conspirator, Barkus, was convicted of a *Klein* conspiracy and the district court included interest and penalties from uncharged relevant conduct of evasion of payment. The Sixth Circuit affirmed.

Here, evasion of payment was part of Ingersoll's *Klein* conspiracy conviction. In fact, the language of count 2 of the superseding indictment expressly alleged that the defendants conspired with one another "to defraud the United States . . . by impeding and obstructing the functions of the Internal Revenue Service and *evading the payment of taxes owed*. . ." (R.24: Superseding Indictment, PgId 80, emphasis added). Specifically, defendants conspired to disguise the transfer of $934,000 in kickbacks from Roy Bradley to Steven Ingersoll, to evade the tax on those funds, and to evade payment of payroll taxes for workers employed by Roy Bradley's construction company.

Funds Transferred To LLCs Owned By Steven Ingersoll Are Taxable To Ingersoll.

Ingersoll argues that the funds that he transferred from SSM and SSI to his LLCs are not taxable to him and should not be included in the tax loss. He is wrong.

The key inquiry is whether Ingersoll had control over the funds that he took from SSM and transferred to his other LLCs. *See United States v. Cseplo*, 42 F.3d

360, 364 (6th Cir. 1994) ( ". . .  substance controls over form, and taxation is concerned with the actual command over the property taxed.", quoting *Davis v. United States*, 226 F.2d 331, 335 (6th Cir.1955)).

Ingersoll appears to contend that the relationship between SSM or SSI and Ingersoll's LLCs is somehow dispositive.   The relationship between SSM or SSI and the Ingersoll LLCs, however, is completely irrelevant.  It does not matter at all whether Ingersoll transfers money from SSM to himself and then to his LLCs, or whether he transfers it directly from SSM to his LLCs.  The result is the same.

For example, if a taxpayer diverted money from his solely owned company and sent it directly to his home mortgage lender to make his house payment, the relationship between the taxpayer's company and the mortgage lender is irrelevant. What matters is that the taxpayer exerted control over the funds that he transferred to the mortgage lender.

Ingersoll cites the Supreme Court's decision in *Boulware v. United States*, 552 U.S. 421, 430 (2008), but *Boulware* does not support his argument.

In *Boulware*, the defendant was convicted of 26 U.S.C. §7201 based on diverting funds from his closely held company and paying millions to his girlfriend and wife.  During the trial, Boulware sought to argue that the funds that he took from his company were not income or a shareholder distribution, but rather were a return of his basis in the company.  The government moved in limine to bar

36

evidence of Boulware's return of capital theory. Prior Ninth Circuit case law required the defendant to show that the taxpayer and/or the corporation intended the payment to be a return of capital. *Id.* at 427. When the defendant did not make such a showing, the district court granted the government's motion. The defendant was subsequently convicted. The Ninth Circuit affirmed.

On appeal to the Supreme Court, the court reversed the conviction and the Ninth Circuit's holding that a defendant must show that the payment to the shareholder was intended to be a return of capital. The Supreme Court held, "A defendant in a criminal tax case does not need to show a contemporaneous intent to treat diversions as returns of capital before relying on [26 U.S.C. §§301 and 316] to demonstrate no taxes are owed." *Boulware*, 552 U.S. at 439 (2008).

Nothing in *Boulware* stands for the proposition that funds transferred by Ingersoll to his LLCs are not taxable to Ingersoll. If that were the case, *Boulware* would have focused on the fact that the defendant paid the corporate money to his wife and girlfriend, rather than take it himself. Nor has the government been able to find any authority for Ingersoll's interpretation of *Boulware* that his tax loss should be calculated at the capital gains tax rate. The case law from this district is to the contrary. *See United States v. Wolf*, 2008 WL 2117610, at *1 (E.D. Mich. May 20, 2008) (Denying defendant's argument under *Boulware* that the tax loss should be calculated at the lower capital gains rate.) *See also United States v.*

37

*Cseplo*, 42 F.3d 360, 364 (6th Cir. 1994) ("The label attached to wrongfully diverted money, our caselaw teaches, is unimportant.  It is not necessary to describe such funds as additional salary, illicit bonuses, or commissions, or anything more than wrongful diversions. . . .") (Internal quotes omitted).

<u>Ingersoll's Proposed Conduit Theory Is Unfounded</u>.

Ingersoll's brief also addresses his conduit theory.  Ingersoll's argument is that SSM and SSI used Ingersoll as a conduit for SSM and SSI's investments in Ingersoll's other companies and in the Bay City Academy project.  There are at least two reasons why the conduit theory does not apply here.

First, SSM and SSI did not have additional money to spend or invest in Ingersoll's LLCs.[16]  As Ingersoll's brief noted, "It is undisputed that SSM had no accumulated earnings and profits . . . ."  (Def. Br. at 10, PgId 3890).

On January 1, 2009, SSM had three bank accounts with positive balances.  A Fifth Third account ending in 1584 (Trial Ex. 225A), a Traverse City State Bank account ending in 5646 (Trial Ex. 210A), and another Traverse City State Bank account ending in 0789 (Trial Ex. 215A), which was SSM's payroll account.  The total combined balance on those three accounts as of January 1, 2009, was $10,904.21.  For the tax year 2009, SSM filed a tax return in which it claimed that it had a loss of $52,047.  (Trial Ex. 111).  For the tax year 2010, SSM's return

---

[16] All of Ingersoll's interests in Bay City were owned by various LLCs, which he in turned owned.

showed a loss of $5,356. (Trial Ex. 112). Based on SSM's reported losses and lack of retained earnings, therefore, SSM did not have money to invest in Ingersoll's LLCs. SSM also did not have the means to make a shareholder loan to Ingersoll.

A portion of SSM's reported loss is based on depreciation, which is a non-cash expense. Even when accounting for this, SSM would not have funds to invest in Ingersoll's LLCs or to advance to Ingersoll as a shareholder loan. Ingersoll may argue that SSM had additional available funds from SSM's line of credit at Traverse City State Bank. Based on Ingersoll's statement to the bank, however, none of those funds ever went to the Bay City Academy project. Ingersoll stated to the loan officer that all of the line of credit proceeds were used for GTA. (See Att. 605: Email exchange between Steven Ingersoll and Dan Stahl of TCSB, attached).

In 2009 and 2010, SSI did have some available funds, but those funds did not exceed the amount that the IRS credited as being non-taxable as an increase in Ingersoll's shareholder loan. Therefore, SSI could not have invested money in Ingersoll's LLCs, or given a shareholder loan in excess of the amount already calculated by the IRS.

On January 1, 2009, SSI had one bank account at Fifth Third Bank ending in 0176 with a balance of $40,851.59. (Trial Ex. 229A). For the tax year 2009, SSI filed a tax return showing income of $49,545. (Trial Ex. 101). For the tax year

2010, SSI filed a return showing income of $10,526. (Trial Ex. 102). SSI did not claim a depreciation deduction in 2009 or 2010. That means in total, SSI could have lent Ingersoll $100,922.59. The IRS gave Ingersoll credit for a shareholder loan increase for 2009 and 2010 totaling $103,639.16. (Att. 533A: 2009 Steven Ingersoll Unreported Income; 534A: 2010 Steven Ingersoll Unreported Income, attached). This exceeds the amount of funds that SSI had available to lend to Ingersoll. Further, SSI would have had no additional funds to invest in Ingersoll's LLCs.[17]

Another reason that defendant's conduit theory fails is because SSM and SSI were not the primary beneficiaries of the payments to Ingersoll's LLCs. Ingersoll's brief notes, "the basic issue is whether the corporate expenditure was incurred primarily to benefit the corporation's trade or business, or primarily for the personal benefit of the shareholders." (Def. Br. at 11, PgID 3891). Ingersoll also cites *Zhadanov v. Commissioner*, T.C. Memo. 2002 WL 731708, *11, for the proposition that there is a two-step inquiry to determine whether a taxpayer acted as a conduit. Ingersoll argues that the first step is to determine wither the corporation conferred an economic benefit on the shareholder without expectation of repayment. The second step is to determine whether the benefit primarily

---

[17] Ingersoll did receive funds from SSI and SSM in 2009 and 2010, but the principal source of those funds was GTA. SSI and SSM did not accurately report those funds as income on their respective Form 1120 returns.

advanced the shareholder's interest as opposed to the corporation's interest.  (Def.

Br. at 11, PgId 3891-92).

Even using this analysis, Ingersoll was not a conduit for SSI and SSM.

First, Ingersoll received funds from SSM and SSI without an expectation of

repayment.  As the evidence has demonstrated and as defendant has previously

noted, there were no loan documents, no agreed terms of repayment, no agreed

interest rates.  While there were inconsistent entries in at least three different

versions of Ingersoll's QuickBooks accounting software stating that payments

were shareholder loans, there was no other documentation of a loan or expectation

of repayment on the part of SSM, SSI and Ingersoll.  Ingersoll either received the

funds, or exerted control over the funds in transferring them to one of his entities.

In either situation, he received an economic benefit.

Second, to the extent that Ingersoll used the SSM and SSI funds for the Bay

City Academy project and other investments in Bay City, such funds principally

advanced Ingersoll's interests because he personally was the owner/member of all

of the LLCs which owned the assets related to those investments.  SSI and SSM

did not own anything in Bay City.  The buildings that were part of the Bay City

Academy project were all owned by LLCs registered to Ingersoll.  Smart Schools

Bay City, the management company for the Bay City Academy, was an LLC

registered to Ingersoll.  Ingersoll's LLCs even owned numerous houses around the

Bay City Academy.  To the extent that funds went from SSM and SSI into the Bay City projects, all of the funds represented Ingersoll's own direct investment in entities he owned.  Accordingly, he, and not SSM or SSI, was the primary beneficiary.

Ingersoll's Proposed Shareholder Loan Theory Is Likewise Unfounded.

As addressed above, neither SSM nor SSI had sufficient retained earnings or reported income to make a shareholder loan to Ingersoll in excess of the amount already calculated by the IRS.  Ingersoll may argue, as one of his alternative theories, that SSM had funds available from its line of credit at Traverse City State Bank.  He may claim that SSM loaned him those proceeds.  However, Ingersoll has repeatedly noted in argument and in filings that SSM, a Subchapter C Corporation, was wholly owned by SSI, a Subchapter S Corporation.  That means that Ingersoll was not a shareholder of SSM, and therefore could not receive a shareholder loan from SSM.  Ingersoll was, however, a W-2 employee of Smart Schools.  All unreported funds flowing from SSM to Steven Ingersoll are properly characterized simply as diverted income.

Ingersoll's Unsubstantiated Deductions, Credits and Exemptions Must Be Disregarded.

Ingersoll has submitted a proposed Defense Exhibit 101, which includes exhibits A-5, A-6 and A-7.  As will be discussed in further detail in a separate motion to exclude or strike, Ingersoll has not provided proper substantiation for the

42

deductions, credits and exemptions claimed in exhibits A-5, A-6 and A-7 in

Defense Exhibit 101.  Accordingly, the information in sub-exhibits A-5, A-6 and

A-7 should be excluded or stricken from the record and disregarded by the court.

Ingersoll and any witness called by him should be precluded from testifying

regarding or relying on the information is those same sub-exhibits.

                                  Respectfully submitted,

Date:  February 19, 2016          Barbara L. McQuade
                                  United States Attorney


s/ Jules M. DePorre               s/Janet L. Parker
Jules M. DePorre (P73999)         Janet L. Parker (P34931)
Assistant U. S. Attorney          Assistant U.S. Attorney
600 Church Street                 101 First Street, Suite 200
Flint, Michigan 48502             Bay City, MI 48708
(810) 766-5026                    (989) 895-5712
jules.deporre@usdoj.gov           janet.parker2@usdoj.gov

                        Certificate of Service

On February 19, 2016, I filed the above pleading and attached exhibits with the
Clerk of the Court using the ECF system that will automatically serve counsel of
record.

                                  s/Janet L. Parker