UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,                    Case No. 14-cr-20216

v                                          Honorable Thomas L. Ludington

D-1 STEVEN J. INGERSOLL,

                  Defendant.

_____/

## OPINION AND ORDER ADDRESSING SENTENCING ISSUES

On April 11, 2014, Defendants Steven Ingersoll, his wife Deborah Ingersoll, his brother Gayle Ingersoll, Roy Bradley, and Roy Bradley's wife Tammy Bradley were indicted for various crimes related to their alleged participating in a conspiracy to commit bank fraud, conspiracy to commit tax evasion, wire fraud, and tax evasion.   The Superseding Indictment charged the Defendants as follows:

- Count 1 charged Steven Ingersoll, Deborah Ingersoll, Gayle Ingersoll, Roy Bradley, and Tammy Bradley with conspiracy to defraud a financial institution related to a Chemical Bank loan on January 2011 in violation of 18 U.S.C. § 1349 ("[Defendants] engaged in a series of transactions that diverted part of the Chemical Bank construction loan proceeds away from the construction project and to a joint, personal bank account in the name of Steven Ingersoll and Deborah Ingersoll at Fifth-Third bank.").

- Count 2 charged Steven Ingersoll, Gayle Ingersoll, and Roy Bradley with conspiracy to commit tax evasion related to the use of the January 2011 Chemical Bank loan in violation of 18 U.S.C. § 371 ("[D]efendants herein, knowingly conspired with each other and others … to defraud the United States and the Internal Revenue Service of the Department of the Treasury … by impeding and obstructing the functions of the Internal Revenue Service and Evading the payment of taxes owed….").

- Count 3 charged Steven Ingersoll with wire fraud on June 29, 2011, related to the January 2011 Chemical Bank Loan in violation of 18 U.S.C. § 1343 ("On or about June 29, 2011 … Steven J. Ingersoll … did knowingly transmit and cause

the transmission of writings, signs and signals by means of wire communication in interstate commerce for the purpose of executing the scheme, that is the transfer of $704,000 of construction loan proceeds away from the Madison Arts account at Chemical Bank to Roy Bradley and Tammy Bradley's construction Company's account at Catholic Federal Credit Union….").

- Count 4 charged Steven Ingersoll and Tammy Bradley with wire fraud on June 30, 2011, related to the January 2011 Chemical Bank Loan in violation of 18 U.S.C. § 1343 ("On or about June 30, 2011 … Steven J. Ingersoll and Tammy S. Bradley … did knowingly transmit and cause the transmission of writings, signs and signals by means of wire communication in interstate commerce for the purpose of executing the scheme, that is, an electronic transfer of $704,000 of construction loan proceeds away from Roy Bradley and Tammy Bradley's construction company's Catholic Federal Credit Union account to Gayle R. Ingersoll's business account at United Bay Community Credit Union….").

- Count 5 charged Steven Ingersoll and Gayle Ingersoll with wire fraud on June 30, 2011, related to the January 2011 Chemical Bank Loan in violation of 18 U.S.C. § 1343 ("On or about June 30, 2011 … Steven J. Ingersoll and Gayle R. Ingersoll … did knowingly transmit and cause the transmission of writings, signs and signals by means of wire communication in interstate commerce for the purpose of executing the scheme, that is, an electronic transfer of $704,000 of construction loan proceeds from Gayle R. Ingersoll's business account at United Bay Community Credit Union to Steven Ingersoll's personal bank account at Fifth-Third Bank….").

- Count 6 charged Steven Ingersoll with failure to report taxable income for the year 2009 in violation of 26 U.S.C. § 7201 ("On or about May 11, 2010 … Steven J. Ingersoll … did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 2009, by causing to be prepared, and by signing and causing to be signed, a false and fraudulent U.S. Individual Income Tax Return….").

- Count 7 charged Steven Ingersoll with failure to report taxable income for the year 2010 in violation of 26 U.S.C. § 7201 ("On or about October 21, 2011 … Steven J. Ingersoll … did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 2010, by causing to be prepared, and by signing and causing to be signed, a false and fraudulent U.S. Individual Income Tax Return….").

Superseding Indictment 1-12, ECF No. 24.

Each of the Defendants moved for a judgment of acquittal at the conclusion of the Government's case under Federal Rule of Criminal Procedure 29(a). The Court granted the

motions as to Count 1 based on two primary findings. First, the Court found that Defendant Ingersoll did receive the loan proceeds from Chemical Bank as alleged in the indictment, but that he received the loan proceeds as reimbursements for capital he had earlier advanced to a construction project he controlled through his ownership of Madison Arts, LLC ("Madison Arts"). The construction project at issue was the 2010 and 2011 renovation of a church facility that was intended to be leased to a Public Charter Academy in Bay City, Michigan called the Bay City Academy ("BCA"). Madison Arts owned the property to be leased to BCA, and borrowed the relevant funds from Chemical Bank. Madison Arts contracted with a construction company, Thunder Builders, through its principal, Roy Bradley, to remediate asbestos and renovate the building. Second, the Court found that Madison Arts had invested the funds it was required to invest by the loan agreement in order to physically improve the project. This finding was based on evidence that the bank had an independent inspector evaluate the progress of the project and certify that it was sufficiently complete for progress payments to be made, and that the contractors had been paid and materials incorporated into the project before the loan draws were advanced to Madison Arts. *See* ECF No. 152. A judgment of acquittal was therefore entered as to Defendant Deborah Ingersoll on March 6, 2015. *See* ECF No. 153. The other Defendants, while acquitted as to Count 1, remained as defendants on other charges. *See* ECF No. 152.

The Government's case against Defendant Steven Ingersoll with respect to Counts 2, 6, and 7 primarily focused on allegations that in 2009, 2010 and 2011 he received significant sums of money from two closely-held corporate entities that he owned: Smart Schools Management ("SSM") and Smart Schools Incorporated ("SSI"). [1]  Both companies were organized in the early

---

[1] Smart Schools Management is a private, for-profit "C" corporation that is responsible for annual Form 1120 tax returns. The composition of stock ownership and the membership of the board are unknown. In contrast, Smart Schools, Incorporated, is an "S" corporation. Supp. Brief 2 n.2. It was uncontested that both SSM and SSI were controlled by Steven Ingersoll during the relevant time period. *Id.*

2000s, and for the balance of the decade were active in furnishing services to Grand Traverse Academy ("GTA"), a public charter academy located in Traverse City, Michigan. As explained by Ingersoll, SSM was primarily intended to manage or operate public charter academies, known more colloquially as "charter schools" (and hereinafter referred to as "charter schools"), under contract with the academies. SSI was organized to retain Ingersoll's intellectual property interest in the Integrated Visual hearing system, which will later be described, and to receive royalty income from licensing the intellectual property to third parties. The Government alleged funds that SSM and SSI earned from GTA were distributed to Ingersoll at his direction and were unreported taxable income.

The Government's case against Defendant Roy Bradley focused on his role as the principal of Thunder Builders, the company Defendant Ingersoll retained on behalf of Madison Arts to remediate and renovate the BCA school building and to perform work on "Front Porch Initiative" residences, which will also be explained hereinafter.[2] Defendant Ingersoll had initially obtained an estimate from a local architect to renovate the building that exceeded $6,000,000. Bradley contractually agreed to complete the renovation for $2,600,000 or less. The Government presented evidence that Bradley did not report cash-payments to employees to the Internal Revenue Service while working on the Madison Arts project. The Government also emphasized that on December 2, 2014, after a seven day jury trial, Bradley was convicted of four violations of the Clean Air Act for the improper remediation and disposal of asbestos arising out of the Madison Arts project. *See United States v. Bradley*, Case No. 13-cr-20622. Significantly, the party who sold Defendant Ingersoll the old church building had an asbestos assessment

---

[2] For reasons that remain unknown to the Court, the Construction Contract for 400 Madison Avenue recites that the owner/developer of the project was Front Porch Renaissance Group, LLC and the general contractor was Lasting Impressions Construction Company. Ingersoll signed the contract on behalf of the owner and Bradley signed on behalf of Lasting Impressions.

completed, which formed the baseline expectation for the asbestos Bradley should have safely removed from the building, but did not. Accordingly, the Government argued, Ingersoll and Bradley benefited at the expense of third parties, particularly at the expense of the United States treasury.

After a fourteen-day trial that began on February 10, 2015 and ended on March 10, 2015, a jury convicted Defendant Steven Ingersoll of two counts of tax evasion (Counts 6 and 7) for the tax years 2009 and 2010. The jury also found Defendant Ingersoll and Defendant Bradley guilty of conspiring to commit tax evasion (Count 2). *See* ECF No. 154. Defendants Gayle Ingersoll and Tammy Bradley were found not guilty, and their judgments of acquittal were entered on March 18, 2015. *See* ECF No. 162-63.

Following Defendant Ingersoll's conviction, the probation department prepared a Presentence Investigation Report ("PSR"), completed on April 29, 2015 and revised on June 26, 2015. Both the Government and Ingersoll raised objections to the PSR, identifying the following disputes: (1) whether Defendant Ingersoll should be assessed two additional guideline points for abusing a position of trust and his use of a special skill with GTA pursuant to U.S.S.G. § 3B1.3; (2) whether additional guideline points should be assessed for Defendant Ingersoll's leadership role in a criminal conspiracy pursuant to U.S.S.G. § 3B1.1(a); (3) whether Ingersoll should be assessed two additional guideline points because of his use of sophisticated means to commit the offense under U.S.S.G. § 2T1.1(b)(2); (4) whether Ingersoll attempted to obstruct justice within the meaning of U.S.S.G. § 3C1.1; and (5) the proper assessment of Defendant Ingersoll's tax loss from 2009 to 2011. The PSR concluded that the total tax loss attributable to Defendant Ingersoll for all years was $2,699,673.48, which, based upon the tax tables set forth at U.S.S.G. §

- 5 -

2T1.1(a), assigned Ingersoll a base offense level of 24 (for a tax loss greater than $2,500,000 but less than $7,000,000). Finally, GTA, by counsel, has sought restitution for $1,626,020.00.

Ingersoll's sentencing hearing began on October 20, 2015, and spanned 15 days over a nine month period. The sentencing hearings were primarily devoted to testimony regarding the aforementioned disputes. This opinion seeks to address the evidence related to those disputes, some of which was learned during the two trials and some of which was presented during the sentencing hearings, altogether spanning a period of nearly three years.

## I.

Defendant Steven Ingersoll is an optometrist and entrepreneur who, during the period of time addressed by the indictment, divided his time between Traverse City and Bay City, Michigan. He obtained his doctorate in optometry from Ferris State in 1980 and proceeded to work as a clinical optometrist consulting in various specialty clinics.

## A.

Ingersoll's background in optometry and his interest in learning and education led him to develop an educational curriculum based on a process of learning referred to as Integrated Visual Learning ("IVL"). The premise of IVL is that human learning is visually dominant, and that a student's knowledge and memory is reliant on imagery. IVL was designed by Ingersoll to improve learning for students of all backgrounds, but was particularly designed to assist students with attention deficit disorder and other learning disabilities. The IVL model was eventually implemented as the Smart Schools Model, and was intended to reduce or eliminate the need for behavior altering drugs. Ingersoll traveled internationally lecturing on the IVL learning methodology.

The probation officer received numerous testimonial letters from members of the public related to Defendant Ingersoll's efforts, that have been furnished to the Court. The following, while edited to protect the identity of the author, was typical of many of the letters:

> Our 10 year old son had some difficulties. He stuttered, could not catch a ball, and was unable to walk without frequently tripping. We had spent a lot of time and resources trying to learn the source of his problems and how to correct them. A teacher at GTA suggested that we talk with Dr. Ingersoll about [our son] and GTA's [IVL] Program.
>
> My wife and I met with [Ingersoll]. He spent hours explaining the probable history and causes of [our son's] difficulties; why he stuttered in his particular way, why he could not catch a ball (because he did not anticipate what the ball would do in the future based on what he had already seen it do), why he tripped. He explained how he would tailor the IVL program to meet [our son's] specific needs. He explained how and why each of the steps and exercises would address [our son's] areas of difficulty and help him develop out of them.
>
> [Our son's] outcome is remarkable. He is now a 17 year old high school junior. He has no continuing issues with speech, with catching a ball, or with tripping….

The testimonial letters furnish some insight into Defendant Ingersoll's personal "characteristics", which are relevant under 18 U.S.C. § 3553(a)(i) specifically, and relevant in determining his motivation for the offense as it relates to the statutory sentencing factors more generally. Ingersoll was not motivated exclusively by material greed. On the contrary, he believed in the Smart Schools learning model and the Front Porch Initiative and was driven to expand the model to Bay City and the I-75 corridor. The success of the project preoccupied Ingersoll, causing him to knowingly disregard legal responsibilities including the maintenance of basic accounting records, to misreport his working capital for the project, and to disregard the safety of construction workers.

### i.

Defendant Ingersoll's development of IVL and the Smart Schools learning model coincided with the development of Michigan charter schools in the mid-1990's. In Michigan,

charter schools are state-supported public schools under the state constitution that operate under a charter contract. *See* Michigan Revised School Code, M.C.L. § 380.501 *et seq.* *See also Michigan Charter Schools*ˏ Mɪᴄʜ. Dᴇᴘᴛ. Eᴅᴜᴄ. (Jan. 2016) https://www.michigan.gov/documents/PSAQA_54517_7.pdf. The schools must be chartered by the governing board of a public body, known as the authorizing entity, that is authorized to issue charter contracts under M.C.L. § 380.501. Such authorizing bodies must either be a board of a school district that operates grades K through 12, an intermediate school board, the board of a community college, or the governing board of a state public university. *Id.*

Once authorized, charter schools may not charge tuition, may not be religiously affiliated, and must serve anyone who applies to attend up to the school's enrollment capacity. *See* M.C.L. § 380.504(2). Teachers must be certified and "highly qualified" and charter schools must administer all mandatory state assessments. *See* M.C.L. § 380.505(1). Charter schools are required to follow a common fiscal year, use generally accepted accounting principles for governing entities, follow a uniform chart of accounts, and submit comprehensive financial reports into a state database. *See* M.C.L. §§ 380.1133, 380.1281(c), 388.1618(3)-(5). Charter schools also must undergo annual independent audits of their financial accounting records conducted by a certified public accountant, which are subject to government auditing standards. *See* M.C.L. § 388.1618(2). Charter schools must adopt a budget prior to the commencement of each fiscal year, and charter schools may not adopt or operate a deficit budget. M.C.L. § 380.1220. In the event a charter school falls into a deficit, it must file a deficit elimination plan which must be approved by an office within the Michigan Department of Education. *See* M.C.L. § 388.1702.

Charter schools are funded through the State School Aid Act, M.C.L. § 388.1701 *et seq.*, and therefore receive funding from the state on a per-pupil basis like traditional public schools.[3] Charter schools also may qualify for state and federal grants in the same manner as traditional public schools. *See* M.C.L. § 380.504(a)(f). State and federal education dollars need not be sent to the authorizing body of the charter school, but instead federal grant funds from the Michigan Department of Education may be provided directly to the charter school.

Pupils are not automatically assigned to charter schools. Instead, charter school attendance, and therefore charter school funding, is dependent on parent choice.

Charter schools are governed by charter school boards, which are charged with governance, policy, budgeting, legal compliance, academic performance, and growth and strategic planning for the school. Each board member is a public official, required to swear a constitutional oath of office in the state of Michigan. Before appointment, each board member must undergo a selection and appointment process established by the charter school's authorizing entity. While Michigan law permits the developer of a new charter school to appoint the members of an initial governing board, it remains the responsibility of the authorizer to ensure that all board members are both qualified and independent.

Charter schools in Michigan are often developed and operated by privately-owned, for profit management companies that serve under contract to the charter school. *See* M.C.L § 380.501(e) ("An entity can be a partnership, nonprofit or business corporation, labor organization, or any other association, corporation trust, or other legal entity."). The authorizing entity approves the contract and confers authority on the private entity to operate the public school academy. M.C.L. § 380.502. During the public school academy formation process, the

---

[3]  In Michigan, funding to school districts is predominantly based on pupil head counts. "Per pupil funding provides that if a student leaves a traditional public school for a PSA, that state money received by the school leaves with him or her." Peters, at 563.

private entity proposes members of the board of directors for the public school academy. M.C.L. §380.502(3)(b).   While school boards address most of the governance issues, private management companies often perform most of the day-to-day functions such as providing teachers and curriculum for the institution, as well as payroll, human resource services, janitorial services, and building maintenance.   The management company often, if not usually, employs the staff that operates the school.  *See* Tracy Peters, *Demanding More from Michigan's Charter Schools*, 13 J. L. Society 555, 559 (2012).    The Michigan Department of Education has acknowledged concerns regarding whether such management companies are able to exercise undue influence or control over charter school boards through their power to name their own governing boards at the outset.  *See Michigan Charter Schools*¸ MICH. DEPT. EDUC. (Jan. 2016) https://www.michigan.gov/documents/PSAQA_54517_7.pdf.

### ii.

At the time of the events relevant to the indictment, Ingersoll had already participated in the establishment of several charter schools, including Livingston Academy, and had been involved with a variety of school districts to implement his IVL model. *See* Sentencing Tr. 12/08/2015 p. 5.  In 1997 Ingersoll began the process of establishing GTA in Traverse City, Michigan, where he was to become its Chief Administrator, though not an identified officer or member of the board of directors.  GTA was authorized by Lake Superior State University as an operating Charter School in 1998.  Lake Superior State signed a contract with Ingersoll's wholly owned entities, SSM and SSI, in July of 1999. *Id*. at 6, 12. GTA, in turn, entered into annual agreements with SSM and SSI to operate the academy in exchange for 12 percent of the gross revenue received by GTA.

Most recently, in 2010 and 2011 Ingersoll became a founder of the BCA, located in Bay City, Michigan. In founding BCA, Ingersoll's objectives expanded beyond his Smart Schools education model, as he sought to revitalize blighted neighborhoods adjacent to the school. Ingersoll referred to this redevelopment plan as the Front Porch Renaissance Plan or Initiative. Pursuant to that plan, Ingersoll personally or through controlled entities also began purchasing numerous properties in the surrounding area. Through Madison Arts Ingersoll purchased the former church located at 400 North Madison Street in Bay City, Michigan for $270,000. He later entered into the construction agreement with Thunder Builders to renovate the church into a school facility for BCA for no more than $2.6 million. The renovation was to be financed in part by Madison Arts' $1.8 million construction loan from Chemical Bank that was guaranteed by Defendant Ingersoll. Defendant Ingersoll also testified that the Front Porch building purchases were to be financed in part by historical tax credits that evaporated with the return of the indictment.

## B.

As earlier noted, the focal allegation in the Government's case against Defendant Ingersoll (as to counts 2, 6 and 7) was that he transferred funds to himself that were earned by SSM and SSI providing charter school management services to GTA without paying income tax on his receipt of those funds.

### i.

Ingersoll repeatedly acknowledged the poor state of his record keeping particularly with regard to intra-entity transfers. During the sentencing hearing, Ingersoll testified about a meeting he had participated in with his attorney, David Frye, and his accountant, Duane Kundinger. During the meeting, Ingersoll was advised that if he financed the Bay City initiative with funds

loaned by SSM and SSI to himself as he proposed he would need to document the transactions consistent with a business plan for SSM and SSI, and document the use and repayment of the funds to SSM and SSI.  Ingersoll testified that while Mr. Kundinger had agreed to prepare the necessary supporting papers, it had not been accomplished at the time of Mr. Kundinger's death in August of 2010.

After Ingersoll attempted to retain a different accountant in December of 2010, James Camiller C.P.A., he was again informed that the manner in which he was financing his personal development of the Bay City development may be a misuse of SSM and SSI funds without payment of tax. Camiller declined to be Ingersoll's accountant in January of 2011 after all of the business records he reviewed and all of Ingersoll's answers to his questions simply led to more questions.  Camiller explained his concluding conversation and final email to Ingersoll as follows:

Q:   And what did you tell him in that conversation?

A:   I specifically recall telling him that the flow among all these entities looked like Enron.

Q:   And why did you tell him that?

A:   At that time, Enron was in the news as being a major fraud case that involved a conglomerate with lots of entities that moved money amongst all of them but no one had any income.

Q:   After you sent this email to Dr. Ingersoll, did you have any further communications regarding preparing his tax returns?

A:   No.

Q:   … Would you read the line beginning with "I strongly recommend."

A:   I strongly recommend that you engage a CPA firm with a larger breadth of knowledge and resources than what a sole proprietor can offer.  Your situation is complex and confusing.  A firm could provide you with a

multitude of services and resources to encompass all aspects of your
business interests

Q:     Mr. Camiller, is it unusual for you to turn away clients?

A:     Yes.

*See* Camiller Tr., ECF No. 198.  Camiller went on to further explain:

Q:     … [Y]ou identified the potential for tax problems, correct?

A:     That's correct.

Q:     Are those problems distinct or different from the – from poor record
keeping?

A:     Yes.

*Id*. at 41. Ingersoll did not take Camiller's advice, and did not timely retain a CPA firm to
address his tax issues.

**ii.**

By an order dated October 22, 2014, the Court directed the Government to furnish a Bill
of Particulars regarding the tax evasion count and the conspiracy to commit tax fraud count. *See*
ECF No. 59.  Attachment 1 to the Bill of Particulars purported to summarize the net unreported
income allegedly received by Defendant Ingersoll from SSM and SSI for 2009. Bill of
Particulars Attachment 1, ECF No. 61 Ex. 2.  The Government later provided an updated version
clarifying the transfers as follows:

| Date | Amount | To Account | From | Subtotals |
|------|--------|------------|------|-----------|
| 01/08/2009 | $150,000.00 | Personal – FT 1489 | SSI #0176 | |
| 02/20/2009 | $5,000.00 | Excel – BOA 0599 | SSM #1584 | |
| 02/25/2009 | $35,000.00 | Personal – FT 1489 | SSI #0176 | |
| 03/12/2009 | $50,000.00 | Personal – FT 1489 | SSM #1584 | |
| 03/16/2009 | $30,000.00 | American Equity - 7509 | SSM #1584 | |
| 03/19/2009 | $5,000.00 | Personal – FT 1489 | SSI #0176 | |
| 03/24/2009 | $15,000.00 | Personal – FT 1489 | SSI #0176 | |
| 03/24/2009 | $15,000.00 | Personal – FT 1489 | SSM #1584 | |
| 04/02/2009 | $35,000.00 | Personal – FT 1489 | SSM #1584 | |

- 13 -

| | | | |
|---|---|---|---|
| 04/07/2009 | $5,000.00 | Excel – BOA 0599 | SSM #1584 |
| 04/14/2009 | $15,000.00 | Personal – FT 1489 | SSM #1584 |
| 04/15/2009 | $1,000.00 | Webster House – FT 9527 | SSI #0176 |
| 04/16/2009 | $30,000.00 | Personal – FT 1489 | SSM #1584 |
| 04/20/2009 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 04/29/2009 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 05/07/2009 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 05/15/2009 | $10,000.00 | Personal – FT 1489 | SSM #1584 |
| 05/15/2009 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 05/19/2009 | $5,000.00 | Personal – FT 1489 | SSI #0176 |
| 05/20/2009 | $5,000.00 | Personal – FT 1489 | SSI #0176 |
| 06/03/2009 | $8,000.00 | Personal – FT 1489 | SSI #0176 |
| 06/09/2009 | $18,000.00 | Personal – FT 1489 | SSI #0176 |
| 07/07/2009 | $10,000.00 | Personal – FT 1489 | SSI #0176 |
| 07/16/2009 | $15,000.00 | Personal – FT 1489 | SSM #1584 |
| 07/23/2009 | $1,500.00 | Excel – BOA 0599 | SSM #1584 |
| 07/28/2009 | $5,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/04/2009 | $5,000.00 | Excel – BOA 0599 | SSM #1584 |
| 08/06/2009 | $35,000.00 | Personal – FT 1489 | SSM #1584 |
| 08/10/2009 | $10,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/11/2009 | $7,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/11/2009 | $5,000.00 | Excel – BOA 0599 | SSM #1584 |
| 08/25/2009 | $35,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/31/2009 | $10,000.00 | Personal – FT 1489 | SSI #0176 |
| 09/04/2009 | $70,000.00 | Personal – FT 1489 | SSI #0176 |
| 09/11/2009 | $20,000.00 | Personal – FT 1489 | SSI #0176 |
| 09/15/2009 | $20,000.00 | Personal – FT 1489 | SSI #0176 |
| 09/29/2009 | $5,000.00 | Personal – FT 1489 | SSM #1584 |
| 10/06/2009 | $4,000.00 | Personal – FT 1489 | SSI #0176 |
| 10/23/2009 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 10/26/2009 | $35,000.00 | Personal – FT 1489 | SSM #1584 |
| 10/26/2009 | $5,000.00 | Excel – BOA 0599 | SSM #1584 |
| 10/30/2009 | $5,000.00 | Personal – FT 1489 | SSI #0176 |
| 11/09/2009 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 11/24/2009 | $2,000.00 | Webster House – FT 9527 | SSI #0176 |
| 12/01/2009 | $2,000.00 | Personal – FT 1489 | SSI #0176 |
| 12/09/2009 | $1,000.00 | Webster House – FT 9527 | SSI #0176 |
| 12/14/2009 | $5,000.00 | Personal – FT 1489 | SSM #1584 |
| 12/14/2009 | $6,000.00 | Webster House – FT 9527 | SSI #0176 |
| 12/15/2009 | $1,000.00 | Personal – FT 1489 | SSI #0176 |
| 12/15/2009 | $6,000.00 | Personal – FT 1489 | SSM #1584 |
| 12/15/2009 | $1,000.00 | Webster House – FT 9527 | SSI #0176 |
| 12/18/2009 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 12/21/2009 | $50,000.00 | Personal – FT 1489 | SSI #0176 |
| 12/21/2009 | $10,000.00 | Excel – BOA 0599 | SSM #1584 |

$844,500.00

|            | Repayments:    |            |                           |
|------------|----------------|------------|---------------------------|
| 03/17/2009 | $(10,000.00)   | SSM #1584  | Personal – FT 1489        |
| 05/18/2009 | $(6,780.89)    | SSI #0176  | Personal – FT 1489        |
| 10/13/2009 | $(26,000.00)   | SSM #0789  | Personal – FT 1489        |
| 11/12/2009 | $(35,000.00)   | SSM #0789  | Personal – FT 1489        |
| 12/02/2009 | $(22,000.00)   | SSM #5646  | Personal – FT 1489        |
| 12/10/2009 | $(10,000.00)   | SSM #0789  | Personal – FT 1489        |
| 12/10/2009 | $(15,000.00)   | SSM #1584  | Personal Chemical 5867    |
| 12/16/2009 | $(5,000.00)    | SSM #1584  | Webster House – FT 9527   |
| 12/17/2009 | $(1,000.00)    | SSI #0176  | Personal – FT 1489        |

|                                              |                  |
|----------------------------------------------|------------------|
|                                              | $(130,780.89)    |
| Transfers To SJI:                            | $713,719.11      |
| Less: SJI Sch C - Gross Receipts:            | $(150,000.00)    |
| Net Transfers To SJI:                        | $563,719.11      |
| Less: increase to SJI Loan to S/H Account:   | $(27,075.18)     |
| **Taxable Distributions to SJI For 2009:**   | **$536,643.9**   |

*See* Exhibit 533B, ECF No. 322-3.

Attachment 2 to the Bill of Particulars summarized the net funds received by Defendant from SSM and SSI for 2010. *See* Bill of Particulars Attachment 2, ECF No. 61 Ex. 3. As with the 2009 report, the Government later clarified the transactions as follows:

| Date       | Amount       | To Account                     | From Subtotals |
|------------|--------------|--------------------------------|----------------|
| 01/05/2010 | $90,000.00   | Personal – FT 1489             | SSI #0176      |
| 01/06/2010 | $90,000.00   | Personal – FT 1489             | SSI #0176      |
| 01/12/2010 | $70,000.00   | Excel – BOA 0599               | SSM #1584      |
| 01/19/2010 | $14,169.70   | Personal – American Express    | SSM #1584      |
| 01/20/2010 | $30,000.00   | Personal – FT 1489             | SSI #0176      |
| 01/25/2010 | $2,526.22    | Excel – BOA 0599               | SSM #1584      |
| 01/26/2010 | $6,418.06    | Custom Closing Service - 1852  | SSM #1584      |
| 02/08/2010 | $35,000.00   | Personal – FT 1489             | SSI #0176      |
| 02/10/2010 | $2,000.00    | Webster House – FT 9527        | SSI #0176      |
| 02/16/2010 | $8,000.00    | Excel – BOA 0599               | SSM #1584      |
| 03/01/2010 | $30,000.00   | Personal – FT 1489             | SSM #1585      |
| 03/04/2010 | $25,000.00   | Personal – FT 1489             | SSI #0176      |
| 03/05/2010 | $20,000.00   | Personal – FT 1489             | SSI #0176      |
| 03/08/2010 | $23,000.00   | Webster House – FT 9527        | SSI #0176      |
| 03/12/2010 | $50,000.00   | Personal – FT 1489             | SSI #0176      |
| 03/30/2010 | $130,000.00  | Personal – FT 1489             | SSI #0176      |
| 03/31/2010 | $3,000.00    | Webster House – FT 9527        | SSI #0176      |
| 04/07/2010 | $100,000.00  | Personal – FT 1489             | SSI #0176      |
| 04/07/2010 | $200,000.00  | Personal – FT 1489             | SSI #0176      |

| | | | |
|---|---|---|---|
| 04/19/2010 | $180,000.00 | Personal – FT 1489 | SSI #0176 |
| 04/19/2010 | $10,000.00 | Great Lakes Vision Serv – | |
| | | 1st Merit 8808 | SSI #0176 |
| 04/29/2010 | $35,000.00 | Personal – FT 1489 | SSI #0176 |
| 04/30/2010 | $15,000.00 | Personal – FT 1489 | SSI #0176 |
| 05/04/2010 | $180,000.00 | Personal – FT 1489 | SSI #0176 |
| 05/07/2010 | $1,000.00 | Webster House – FT 1489 | SSI #0176 |
| 05/28/2010 | $3,000.00 | Excel – BOA 0599 | SSM #1584 |
| 06/11/2010 | $15,000.00 | Excel – BOA 0599 | SSI #0176 |
| 06/16/2010 | $5,000.00 | Mark D. Noss – PNC 0728 | SSI #0176 |
| 07/13/2010 | $5,000.00 | Personal – FT 1489 | SSI #0176 |
| 07/14/2010 | $3,000.00 | Webster House – FT 9527 | SSI #0176 |
| 07/15/2010 | $15,000.00 | Personal – FT 1489 | SSI #0176 |
| 07/15/2010 | $15,000.00 | Lasting Impressions – IB 5600 | SSI #0176 |
| 07/22/2010 | $15,000.00 | Personal – FT 1489 | SSI #0176 |
| 07/22/2010 | $20,000.00 | Personal – FT 1489 | SSI #0176 |
| 07/22/2010 | $20,000.00 | Excel – BOA 0599 | SSI #0176 |
| 07/28/2010 | $30,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/10/2010 | $25,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/18/2010 | $15,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/23/2010 | $40,000.00 | Personal – FT 1489 | SSI #0176 |
| 08/24/2010 | $10,000.00 | Excel – BOA 0599 | SSI #0176 |
| 08/27/2010 | $40,000.00 | Personal – FT 1489 | SSI #0176 |
| 09/07/2010 | $60,000.00 | Personal – FT 1489 | SSI #0176 |
| 09/10/2010 | $7,000.00 | Excel – BOA 0599 | SSI #0176 |
| 09/14/2010 | $175,000.00 | Personal – FT 1489 | SSI #0176 |
| 10/12/2010 | $5,000.00 | Excel – BOA 0599 | SSM #1584 |
| 10/28/2010 | $20,000.00 | Personal – FT 1489 | SSI #0176 |
| 11/08/2010 | $20,000.00 | Personal – FT 1489 | SSI #0176 |
| 11/09/2010 | $10,000.00 | Personal – FT 1489 | SSI #0176 |
| 11/09/2010 | $7,000.00 | Excel – BOA 0599 | SSI #0176 |
| 11/12/2010 | $10,000.00 | Personal – FT 1489 | SSI #0176 |
| 11/22/2010 | $200,000.00 | Personal – FT 1489 | SSM #5646 |
| 12/02/2010 | $10,000.00 | Personal – FT 1489 | SSI #0176 |
| 12/16/2010 | $5,000.00 | Personal – FT 1489 | SSM #1585 |
| 12/17/2010 | $15,000.00 | Personal – FT 1489 | SSI #0176 |
| 12/28/2010 | $10,000.00 | Personal – FT 1489 | |

$2,180,113.98

Repayments:

| | | | |
|---|---|---|---|
| 07/02/2010 | $(10,000.00) | SSI #0176 | Personal – FT 1489 |
| 07/06/2010 | $(100,000.00) | SSM #1584 | Personal – FT 1489 |
| 07/21/2010 | $(4,000.00) | SSI #0176 | Personal – FT 1489 |
| 10/06/2010 | $(170,000.00) | SSM #1584 | Personal – FT 1489 |
| 10/19/2010 | $(2,000.00) | SSI #0176 | Personal – FT 1489 |

| | | | |
|---|---|---|---|
| 10/20/2010 | $(2,000.00) | SSI #0176 | Personal – FT 1489 |
| 11/10/2010 | $(8,000.00) | SSI #0176 | Personal – FT 1489 |

|  |  |
|---|---|
| | $(296,000.00) |
| Transfers To SJI: | $1,884,113.98 |
| Less Sch. C - Gross Receipts: | $(271,048.00) |
| Net Transfers: | $1,613,065.98 |
| Less: Increase In Loan to S/H for 2010: | $(76,563.98) |
| **Taxable Distributions to SJI for 2010:** | **$1,536,502.00** |

*See* Exhibit 534B, ECF No. 322-5.

While the Government did not provide a list of 2011 unreported income in its Bill of Particulars, it later provided the following, labeled as Exhibit 535B:

| Date | Amount | To Account | From Subtotals |
|---|---|---|---|
| 01/04/2011 | $20,000.00 | Personal - FT 1489 | SSI #0176 |
| 01/06/2011 | $10,000.00 | Personal - FT 1489 | SSI #0176 |
| 01/06/2011 | $4,000.00 | Excel - BOA 0599 | SSI #0176 |
| 0 1/14/2011 | $10,000.00 | Personal- FT 1489 | SSI #0176 |
| 01/24/2011 | $10,000.00 | Personal- FT 1489 | SSI #0176 |
| 01/26/2011 | $30,000.00 | Personal- FT 1489 | SSI #0176 |
| 01/26/2011 | $7,000.00 | Excel - BOA 0599 | SSI #0176 |
| 02/01/2011 | $3,000.00 | Webster House - FT 9527 | SSI #0176 |
| 02/02/2011 | $10,000.00 | Personal - FT 1489 | SSI #0176 |
| 02/04/2011 | $10,000.00 | Personal- FT 1489 | SSI #0I76 |
| 02/07/2011 | $50,000.00 | Personal - FT 1489 | SSI #0176 |
| 02/09/2011 | $7,000.00 | Excel - BOA 0599 | SSM # 1584 |
| 02/14/2011 | $200,000.00 | Personal - FT 1489 | GI #6356 |
| 02/23/2011 | $30,000.00 | Personal - FT 1489 | SSI #0176 |
| 02/24/2011 | $7,000.00 | Excel - BOA 0599 | SSI #0176 |
| 02/25/2011 | $1,970.52 | Webster House - FT 9527 | SSI #0176 |
| 02/28/2011 | $20,000.00 | Personal - FT 1489 | SSI #0176 |
| 03/01/2011 | $15,000.00 | Personal - FT 1489 | SSM # 1584 |
| 03/04/2011 | $30,000.00 | Personal- FT 1489 | SSI #0176 |
| 03/11/2011 | $80,000.00 | Personal- FT 1489 | SSI #0176 |
| 03/17/2011 | $70,000.00 | Personal- FT 1489 | SSI #0176 |
| 03/28/2011 | $30,000.00 | Personal- FT 1489 | SSI #0176 |
| 04/07/2011 | $30,000.00 | Personal- FT 1489 | SSI #0176 |
| 04/07/2011 | $200,000.00 | Madison Arts - FT 8479 | SSI #0176 |
| 04/07/2011 | $50,000.00 | Madison Arts- FT 8479 | SSI #0176 |
| 04/18/2011 | $30,000.00 | Personal - FT 1489 | SSI #0176 |
| 04/21/2011 | $35,000.00 | Personal - FT 1489 | SSI #0176 |
| 05/02/2011 | $40,000.00 | Personal- FT 1489 | SSI #0176 |
| 05/04/2011 | $30,000.00 | Madison Arts - FT 8479 | SSI #0176 |
| 05/04/2011 | $20,000.00 | Front Porch - FT 8854 | SSI #0176 |

- 17 -

| | | | |
|---|---|---|---|
| 05/05/2011 | $20,000.00 | Personal - FT 1489 | SSI #0176 |
| 05/11/2011 | $10,000.00 | Front Porch - FT 8854 | SSI #0176 |
| 05/12/2011 | $10,000.00 | Personal - FT 1489 | SSI #0176 |
| 05/12/2011 | $4,000.00 | Excel - BOA 0599 | SSM #1584 |
| 05/24/2011 | $70,000.00 | Personal - FT 1489 | SSI #0176 |
| 06/01/2011 | $30,000.00 | Personal - FT 1489 | MMGT #6810 |
| 06/13/2011 | $35,000.00 | Madison Arts- FT 8479 | SSI #0176 |
| 06/14/2011 | $20,000.00 | Personal- FT 1489 | SSI #0176 |
| 06/16/2011 | $50,000.00 | Madison Arts - FT 8479 | SSI #0176 |
| 06/17/2011 | $10,000.00 | Front Porch - FT 8854 | SSI #0 176 |
| 06/20/2011 | $5,000.00 | Personal - FT 1489 | SSM # 1584 |
| 06/21/2011 | $20,000.00 | Personal - FT 1489 | SSM # 1584 |
| 06/22/2011 | $25,000.00 | Personal- FT 1489 | SSM # 1584 |
| 06/30/2011 | $704,000.00 | Personal - FT 1489 | MMGT #6810 |
| 07/01/2011 | $200,000.00 | Madison Arts - FT 8479 | SSI #0176 |
| 07/07/2011 | $40,000.00 | Personal - FT 1489 | SSI #0176 |
| 07/11/2011 | $100,000.00 | Madison Arts - FT 8479 | SSI #0 176 |
| 07/14/2011 | $50,000.00 | Madison Arts- FT 8479 | SSI #OI 76 |
| 07/15/2011 | $50,000.00 | Personal - FT 1489 | SSI #OI 76 |
| 07/21/2011 | $90,000.00 | Personal- FT 1489 | SSI #0176 |
| 07/26/2011 | $75,000.00 | Madison Arts - FT 8479 | SSI #0176 |
| 08/02/2011 | $50,000.00 | Madison Arts- FT 8479 | SSI #0176 |
| 08/03/2011 | $32,000.00 | Front Porch - FT 8854 | SSI #0176 |
| 08/09/2011 | $10,000.00 | Personal - FT 1489 | SSI #0176 |
| 08/19/2011 | $20,000.00 | Madison Arts- FT 8479 | SSM # 1584 |
| 08/19/2011 | $10,000.00 | Front Porch - FT 8854 | SSM # 1584 |
| 08/19/2011 | $10,000.00 | SSB- FT 9027 | SSM # 1584 |
| 08/19/2011 | $25,000.00 | SSB - FT 9027 | SSM # 1584 |
| 08/25/2011 | $7,000.00 | Excel - BOA 0599 | SSI #0176 |
| 08/30/2011 | $7,000.00 | SSB - FT 9027 | SSI #0176 |
| 09/02/2011 | $25,000.00 | Personal - FT 1489 | SSI #0176 |
| 09/02/2011 | $75,000.00 | Madison Arts - FT 8479 | SSI #0176 |
| 09/06/2011 | $10,000.00 | Front Porch - FT 8854 | SSI #0176 |
| 09/06/2011 | $20,000.00 | SSB - FT 9027 | SSI #0176 |
| 09/07/2011 | $35,000.00 | SSB - FT 9027 | SSI #0176 |
| 09/15/2011 | $5,000.00 | Excel - BOA 0599 | SSI #0176 |
| 09/16/2011 | $10,000.00 | Personal - FT 1489 | SSI #0176 |
| 10/07/2011 | $20,000.00 | Personal - FT 1489 | SSI #0176 |
| 10/14/2011 | $20,000.00 | Personal - FT 1489 | SSI #0176 |
| 10/14/2011 | $3,000.00 | Madison Arts - FT 8479 | SSI #0176 |
| 10/21/2011 | $5,000.00 | Personal - FT 1489 | SSI #0176 |
| 10/25/2011 | $60,000.00 | Personal - FT 1489 | SSI #0176 |
| 10/25/2011 | $5,000.00 | Per QB - Steve Ingersoll | SSI #0176 |
| 11/14/2011 | $2,500.00 | Front Porch - FT 8854 | SSI #0176 |
| 11/16/2011 | $2,000.00 | Front Porch - FT 8854 | SSI #0176 |
| 11/17/2011 | $5,000.00 | Personal - FT 1489 | SSI #0176 |

| | | | |
|---|---|---|---|
| 11/21/2011 | $1.00 | SSB - FT 9027 | SSI #0176 |
| 11/21/2011 | $5,000.00 | SSB - FT 9027 | SSI #0176 |
| 11/22/2011 | $3,000.00 | Personal - FT 1489 | SSI #0176 |
| 11/22/2011 | $4,000.00 | Personal - FT 1489 | SSI #0176 |
| 11/23/2011 | $8,000.00 | Personal - FT 1489 | SSI #0176 |
| 11/23/2011 | $10,000.00 | Excel - BOA 0599 | SSI #0176 |
| 11/25/2011 | $25,000.00 | Personal - FT 1489 | SSI #0176 |
| 11/30/2011 | $8,000.00 | Personal - FT 1489 | SSI #0176 |
| 12/05/2011 | $2,000.00 | Front Porch - FT 8854 | SSI #0176 |
| 12/06/2011 | $8,000.00 | Personal - FT 1489 | SSI #0176 |
| 12/07/2011 | $9,000.00 | SSB - FT 9027 | SSI #0176 |
| 12/09/2011 | $2,000.00 | SSB - FT 9027 | SSI #0176 |
| 12/12/2011 | $4,000.00 | Excel - BOA 0599 | SSI #0176 |
| 12/14/2011 | $20,000.00 | Personal - FT 1489 | SSI #0176 |
| 12/14/2011 | $20,000.00 | Personal - FT 1489 | SSM #1584 |
| 12/16/2011 | $8,000.00 | Personal - FT 1489 | SSI #0176 |
| 12/21/2011 | $40,000.00 | Personal - FT 1489 | SSI #0176 |
| 12/22/2011 | $10,000.00 | Personal - FT 1489 | SSI #0176 |
| 12/27/2011 | $10,000.00 | Personal - FT 1489 | SSI #0176 |
| 12/27/2011 | $6,000.00 | Excel - BOA 0599 | SSI #0176 |
| 12/29/2011 | $15,000.00 | Personal- FT 1489 | SSI #0176 |
| | | | $3,408,471.52 |

Repayments:

| | | | |
|---|---|---|---|
| 06/21/2011 | $ (5,000.00) | SSI #0176 | Personal- FT 1489 |
| 08/18/2011 | $ (110,000.00) | SSI #0176 | Madison Arts-FT 8479 |
| 08/24/2011 | $ (10,000.00) | SSI #0176 | Personal- FT 1489 |
| 09/21/2011 | $ (70,000.00) | SSM  1584 | Personal - FT 1489 |
| 10/05/2011 | $ (150,000.00) | SSI #0176 | SSB - FT 9027 |
| 10/06/2011 | $ (20,000.00) | SSI #0176 | SSB- FT 9027 |
| 10/13/2011 | $ (20,000.00) | SSI #0176 | SSB - FT 9027 |
| 10/19/2011 | $ (5,000.00) | SSM #1584 | Personal- FT 1489 |
| 10/20/2011 | $ (5,000.00) | SSI #0176 | SSB- FT 9027 |
| 10/24/2011 | $ (65,000.00) | SSI #0176 | SSB- FT 9027 |
| 11/08/20 11 | $ (2,000.00) | SSI #0176 | Personal- FT 1489 |
| 11/14/2011 | $ (2,000.00) | SSI #0176 | Personal - FT 1489 |
| 11/21/2011 | $ (5,000.00) | SSI #0176 | SSB- FT 9027 |
| 11/22/2011 | $ (20,000.00) | SSI #0176 | SSB- FT 9027 |
| 11/23/2011 | $ (6,000.00) | SSI #0176 | SSB - FT 9027 |
| 11/28/2011 | $ (11,000.00) | SSI #0176 | Personal. FT 1489 |
| 12/07/2011 | $ (2,000.00) | SSI #0176 | Personal - FT 1489 |
| 12/09/2011 | $ (5,000.00) | SSI #0176 | SSB - FT 9027 |
| 12113/2011 | $ (20,000.00) | SSI #0176 | SSB- FT 9027 |
| 12/21/2011 | $ (15,000.00) | SSI #0176 | SSB- FT 9027 |
| | | | $(548,000.00) |

| | |
|---|---|
| Transfers To SJI: | $2,860.471.52 |
| Less Sch. C - Gross Receipts: | $(150,000.00) |
| **Taxable Distributions to SJI for 2011:** | **$2,710.471.52** |

*See* Exhibit 535B, ECF No. 322-7.

In his sentencing narrative, Defendant Ingersoll reports that "the purpose for which most (if not all) of the allegedly unreported income for 2009 and 2010 was spent" was the rehabilitation of the neighborhood adjacent to BCA as part of his Front Porch Renaissance Plan. Similarly, he reports that the allegedly unreported income for 2011 was invested in renovating the Madison Arts Campus that would eventually house BCA. Ingersoll defended his receipt of the funds from SSM and SSI at trial as shareholder loans from the two entities, contending that SSM and SSI had a business purpose to lend him the funds for the Bay City initiative, and that he intended to repay them. In June 30, 2010, the financial statements furnished by Ingersoll to Chemical Bank disclosed a liability payable to SSI of $516,000 and a liability payable to SSM of $187,299.

## C.

While the focus of the indictment was Ingersoll's receipt and use of the funds from SSM and SSI, the question of whether SSM and SSI had contractually earned the funds from GTA became a focal point of the sentencing hearings, in part because GTA sought restitution. At the beginning of each fiscal year, the GTA board met and approved an operating budget and management agreement with SSM. The proposed budget projected, not surprisingly, a revenue neutral budget for GTA. Ms. Heidi M. Wendel, C.P.A, associated with the accounting firm of Dennis, Gartland, & Niergarth, summarized the agreement as the result of her investigation as follows:

> The original management fee with SSM was based on 12% of annual revenue. The management fee agreement was revised at the time of the 2007 bond issuance

- 20 -

because the management fee could no longer be tied to revenue with the bond in place. However, there is a general understanding between GTA and SSM that the management fee would remain at 12% of revenues. The revised contract with SSM simply states the annual management fee will not exceed $2 million.

*See* Ex. 8. Dr. Bruce Harger, the Executive Director of Lake Superior State University from November 2010 to November 2012, testified that SSM's management fee was commercially similar to fees being charged by other charter school management companies at the time.

Importantly, if not surprisingly, GTA remitted nearly all of its incoming revenue to SSM upon its receipt of the funds from the state and federal governments. GTA, however, was unable to immediately operate profitably, and it departed from its adopted budget nearly every year. In order to avoid reflecting an operating deficit, as prohibited M.C.L. § 380.1220, and involving the state of Michigan, Ingersoll and the GTA board at Ingersoll's direction, or at least with Ingersoll's concurrence, began reducing GTA's management fee payable to SSM and SSI in order to reflect to a revenue neutral operating statement. Ingersoll explained the process as follows:

> [W]e used [the end of the fiscal year] to adjust to keep the school from experiencing deficit, and the mechanism by which we did that, initially, was a reduction of management fee creating an accounts receivable at the end of the year then if the – well typically we – we budgeted 12 percent at the beginning of the year, and if it got reduced to 6 percent, then that 6 percent became a receivable at the year-end. And the auditor came in, looked at that, and said okay and then that's – that was the method.

> So later we added to that – we were searching, especially in 2008 – seven, eight, and nine were disastrous years for the academy because of first the fund covenant – the fund balance covenant, followed by the financial collapse in 2008 and the reduction in per pupil funding and its hangover in 2009. Those were three really tough years that – and the [GTA] needed a great deal of support, and we came up with the idea at some point, I think we had actually done that earlier, set up the lease arrangement.

*See* Ingersoll Tr. 75-76, December 8, 2015, ECF No. 262. While the annual management fee was "rebated or reduced" to reflect a balanced budget, much of the reduced fee was not paid to GTA

from SSM or SSI. Instead, the funds that SSM expressed willingness to rebate, but which were not in fact rebated, were accounted for as an asset on GTA's balance sheet as an account receivable due from SSM.

The question of whether SSM was entitled to the management fee pursuant to the annual agreements (12 percent, but not to exceed $2,000,000) or the lesser, rebated sum needed to balance GTA's books was a contested issue during the sentencing hearing. The management agreements do provide for the possibility of amendments, but only with the consent of the parties reduced to a memorandum. No memorandum was ever prepared, and it is apparent that different board members had different views on the subject.

The Government argues that Ingersoll's agreement to account for the rebate as an account receivable to GTA is evidence that Ingersoll agreed to an amendment to the management fee agreement, albeit without consent "reduced to a memorandum." To be properly classified as an account receivable, the Government emphasizes, there has to be a reasonable expectation that the sum will be paid within 90 days, or at least before the beginning of the next accounting period. Ingersoll explained, at one point, that he understood the agreement to provide that the receivable owed by SSM to GTA would eventually be excused when GTA became profitable. Ingersoll explained that, "[t]he controversial $1.6 million 'prepaid' is in actuality the remainder of nearly $5 million of contractual and budget authorized earnings that SSM rebated back to GTA according to its needs. SSM put itself at risk with the understanding that as the Academy's financial condition allowed, SSM would be made whole for this support." *See* Exhibit 586, ECF No. 257 Ex 7. The current chairman of GTA's board Brad Habermehl's testimony was consistent with that view:

> Court:       [Y]ou indicated that while GTA was deferring recovery of the 5
>              million – excuse me, GTA had agreed to excuse the 5 million, they

- 22 -

|  |  |
|---|---|
|  | were still nevertheless entitled to receive it when GTA was able to pay, correct? |
| Habermehl: | Correct. |
| Court: | How do you record GTA's prospective liability to SSM when financial conditions permit them to repay it? How is that obligation to repay the 12 percent recorded at GTA, to your knowledge? |
| Habermehl: | I'm not sure if I'm understanding the question, Judge. |
| Court: | Well, you indicated that SSM was entitled to the full 12 percent? |
| Habermehl: | Correct |
| Court: | They had rebated certain amounts because of the financial condition of GTA? |
| Habermehl: | Yes. |
| Court: | But they were ultimately entitled to the full 12 percent at a point in time in which GTA could afford to pay it? |
| Habermehl: | Correct. |
| Court: | How is that obligation or liability to repay SSM actually recorded in the GTA's books? |
| Habermehl: | It's not.  It's just an agreement that we had with Steve Ingersoll that when the school was going to be financially sound, and we had figured out that about the time now that we're in the school years that we would – our debt would be down, the school numbers of students would be higher and that we would be able to pay the rest of the money back to him for the 12 percent total for each year, so those payments were deferred.  It was never put into the books. |

See Habermehl Tr.

The evidence suggests that the federal government's investigation of the Madison Arts's construction project and the resulting indictment of Thunder Builders' principal Roy Bradley changed Ingersoll's view of the account receivable, if not the GTA board's view of the receivable.  When it became apparent to Ingersoll that the Government was asserting that his

- 23 -

personal receipt of the funds from SSM and SSI was taxable income (and not a repayable loan from SSM and SSI), Ingersoll concomitantly attempted to describe not only his personal receipt of SSM and SSI funds as shareholder loans, but also GTA's receivable due from SSM as a loan from GTA. Meg Harkett, an attorney associated with the Thrun Law Firm, summarized Ingersoll's participation in a May 20, 2013 GTA meeting as follows:

> With regard to the May 20th meeting, it was made clear by Steve Ingersol [sic throughout] at the outset of the meeting that he wanted to the focus of the meeting to be on the handouts he had prepared. The worksheet that Dr. Ingersol wanted to focus on, which primarily outlined his proposed repayment plan, would not only memorialize $3.5 million as being the amount owed to the Academy, which we strongly recommend be verified by an independent third party, it would also require that the Academy agree to characterize this amount as a "loan" from the Academy to Dr. Ingersol. *In fact, towards the conclusion of the meeting Steve Ingersol candidly stated that he "needed" his indebtedness to the Academy to be characterized as a loan for reasons related to his investigation and/or audit by the IRS.* …[M]ischaracterizing this transaction as a loan would subject the Academy and potentially Board members individually, to liability on a number of levels. Steve Ingersol also openly admitted, when asked by us during the May 20th meeting, that a conflict exists between his personal interests and the interests of the Academy.

*See* Thrun Letter p. 4 (emphasis added).

GTA and SSM, by Ingersoll's arrangement, were served by the same accounting firm during the relevant period of time, Midwest Professionals, P.L.L.C. Anthony Henning, the principal at Midwest Professionals, described the transaction to the grand jury as follows:

> Q:          Did you make note of the fact that the reclassification occurred just as the end of the fiscal year was coming to a conclusion?
>
> Henning:    Yes, ma'am. That was the reason for the entry.
>
> Q:          And explain that for us.
>
> Henning:    The school cannot exceed a budget that's been established at the year end. And if there's an expense that is in excess of budget they have to find a way to either amend their budget, so that another expense line item can be expended or whatever the case may be. But when it comes to management fees if it doesn't fit the budget it

- 24 -

has to be removed from the expenditures and that's where the account receivables come from.  The budget cannot handle the management fees that he advanced himself.

Q:              And who was responsible for the reclassification?

Henning:        Mr. Ingersoll.

Q:              Did he discuss the reclassification with you?

Henning:        No ma'am.

…

Q:              Did you ever question him about this type of transaction?

Henning:        No.

Q:              How many times did it occur?

Henning:        Three maybe four times over the years.

Q:              And even though it was a reoccurring – were those consecutive years or were they –

Henning:        They would have been consecutive, yes.

Q:              Did the amount change over time?

Henning:        It fluctuated.

Q:              At the low end it was what?

Henning:        Under $2 million.

Q:              And at the high end?

Henning:        3.8.

Q:              And was that the fluctuation, was it an increase from the $2 million up to the 3.8 or did it go up and down and up and down?

Henning:        It went up and down over years, at the end it went up.

Q:              What was your reaction to that as an auditor?

| Henning: | It bothered me the amount. |
|---|---|
| Q: | Why? |
| Henning: | I can't answer that, it just bothered me.  I did not have any reason to think that there was anything being hidden.  There were, all the transaction were right there.   They were traced to the bank statements, they're going to [SSM]. It was disclosed that [SSM] owed that money back. |
| Q: | Well, how were they denoted on the audit report? |
| Henning: | As a note in the accounts receivable listed as related party receivable. |
| Q: | Is there a reason why it would be identified as related party rather than receivable from Steve Ingersoll or [SSM]? |
| Henning: | No, [SSM] is the related party. |
| Q: | Why would that entity not be referred to by name? |
| Henning: | There's a referral to a related party note that has the name Smart Schools in it.  It did get labeled in the note.  There's, I don't know of any requirement that says I have to list or anyone has to list who all the receivable entities are.  It's no, there's no specific guidelines to that. |

*See* Government's Prehearing Brief Att. 509, ECF No. 234 Ex. 11.

Defendant Ingersoll testified that the fiscal year end budget adjustments were reviewed by GTA's board annually, and that it was a known fact that SSM was rebating no more of its earned management fee than necessary for GTA to operate.  Ingersoll testified that he and the board hoped that GTA would prosper and the SSM receivable would be excused as GTA became profitable, enabling SSM to maintain the management fee the board agreed it had contractually earned.

With the possible exception of Kayne Mentley, the former Superintendent of GTA who acknowledged her limited focus on GTA's financials, the evidence received by the Court confirmed the representation GTA later made on its website:

> Each and every fiscal year of the Academy's existence (FYE 2001 through FYE 2012) GTA's accounting practices and financial structure was reviewed in its annual audit. Annual audits were reviewed every year by Lake Superior State University, Traverse Bay Area intermediate school district, Michigan Department of Education, Michigan Department of Treasury and the Standard and Poors bond rating agency. The Academy's accounting practices and financial structures were never cited or questioned in any way as deficient by a regulatory entity, person or company at any time. As such, those responsible for the Academy's governance and management believe that the Academy's financial practices have always been and remain correct and proper. The history of SSM's contributions and financial support and the related party transactions between SSM and GTA were well known and frequently discussed with the GTA board, its auditors, Michigan Department of Education, and Standard and Poors among others.

*See* http://bridgemi.com/wp-content/uploads/2015/01/pdf2.pdf. *See also* Mentley Aff., ECF No. 234-30.

## II.

In general, sentences must be both procedurally and substantively reasonable. *See Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence may be procedurally unreasonable if a district court fails to calculate or improperly calculates the Guideline range, treats the Guidelines as mandatory, fails to consider the 18 U.S.C. § 3553(a) factors, selects a sentence based on erroneous facts, or fails to adequately explain the chosen sentence. *Id.* "[A] sentence may be substantively unreasonable if the district court chooses the sentence arbitrarily, grounds the sentence on impermissible factors, or unreasonably weighs a pertinent factor." *United States v. Brooks*, 628 F.3d 791, 796 (6th Cir.2011).

A district court should begin all sentencing proceedings "by correctly calculating the applicable Guidelines range," and then should "consider the arguments of the parties and the

factors set forth in § 3553(a)." *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013). The district court "may not presume that the Guidelines range is reasonable and it may in appropriate cases impose a non-Guidelines sentence based on disagreement with the Sentencing Commission's views." *Id.* (quotations and citation omitted). "[A] major departure [from the Guidelines] should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50.

In determining the appropriate Guidelines range, the District Court "is free to – and obviously will – engage in fact-finding as it considers various sentencing options." *See United States v. Gates*, 461 F.3d 703, 708 (6th Cir 2006) (citing *United States v. Milan*, 398 F.3d 445, 456 (6th Cir. 2005). In undertaking such judicial fact-finding for sentencing purposes, courts employ a preponderance of the evidence standard. *Gates*, 461 F.3d at 708 ("[W]e find that judicial fact-finding in sentencing proceedings using a preponderance of the evidence standard post-*Booker* does not violate either Fifth Amendment due process rights, or the Sixth Amendment right to trial by jury."). "[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. 6A1.3. Reliable evidence from the trial of a third party – usually a codefendant – may be used for sentencing purposes as long as the defendant has notice and the opportunity to challenge it. *See Logan v. United States*, 208 F.3d 541, 544 (6th Cir. 2000) ("A district court is indeed permitted to rely on testimony presented at a related proceeding, so long as there are sufficient indicia of reliability."); *Smith v. United States*, 206 F.3d 812, 813 (8th Cir. 2000) (holding that relevant and reliable evidence from a codefendant's trial could be considered by the sentencing court as long as the defendant had notice of and the opportunity to rebut or explain the evidence to be used against him).

While a court "may accept any undisputed portion of the presentence report as a finding of fact," a court "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing[.]" Fed. R. Crim. P. 32(i)(3).

## A.

The first sentencing issue before the Court is whether Defendant Ingersoll should be assessed two additional guideline points for abusing a position of trust and his special skill with GTA pursuant to U.S.S.G. § 3B1.3. That section provides for a two-point enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense". *Id.*

The Government argues that Ingersoll used his position of trust with GTA and his de facto control over GTA's finances to divert millions of dollars to his personal projects, entities, and bank accounts. *See* Gov't Supp. Sentencing Brief 12, ECF No. 274. Defendant Ingersoll served as the Chief Administrator for GTA in addition to owning SSM. He was, as the Government emphasizes, on both sides of every GTA/SSM transaction, including, in its view, the self-interested account receivable loan to SSM. Defendant Ingersoll argues that he did not abuse a position of trust with GTA, and that even if he did GTA is not a relevant victim under Sixth Circuit precedent because the IRS is the only victim of the conduct with which Ingersoll was convicted. *See* Ingersoll Supp. Sentencing Brief 13-15, ECF No. 273.

The Sixth Circuit has held that the abuse-of-trust enhancement "may only be applied where the defendant abused a position of trust with the victim of his charged conduct." citing *United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001) (citing *United States v. Moored*, 997

F.2d 139, 145 (6th Cir. 1993)).  White was the general superintendent at an Ohio County Water District treatment plant in Kentucky, who was responsible for preparing monthly operations reports required by federal and state law to be submitted to the Kentucky EPA's division of water.  A surprise inspection uncovered fraudulent reporting, and led to White's indictment for aiding and abetting fraudulent reports to the government under 18 U.S.C. § 1001. The trial court determined that the abuse-of-trust enhancement should not apply to White's sentence based on his abuse-of-trust with the general public that drank the polluted water. The Sixth Circuit disagreed. The Court first held that the general public may, in certain instances, be victims of a government employee's crimes for the purposes of the abuse-of-trust enhancement. *Id*. The Court then found that the enhancement was appropriate given the facts of the case. The Court reasoned that, although the sentencing commission could not have intended that every "faceless government bureaucrat performing her duties" should be subject to an abuse-of-trust enhancement every time she was convicted of a crime, the quasi-fiduciary trust relationship between the water district and its customers should be imputed to White. *Id*. at 373.

The Sixth Circuit has recently reiterated "[t]he abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct." *United States v. May*, 568 F.3d 597 (6th Cir. 2009) (citing *White*, 270 F.3d at 372.).  In *May* the Sixth Circuit held that the defendant's failure to account for and pay payroll taxes did not warrant an abuse-of-trust enhancement where the defendant did not hold a position of trust in relation to the IRS, the actual victim of his conduct. *Id*. at 603. Similarly, in *United States v. Edkins*, 421 F. App'x 511, 517 (6th Cir. 2010), a tax evasion case, the Sixth Circuit held that the district court erred in applying an abuse-of-trust enhancement based on the defendant's abuse of trust with an entity called Baby Bliss, to which he held himself out as a C.P.A. The Court

- 30 -

explained that the IRS – not Baby Bliss – was the victim of the defendant's tax evasion.  Finding that Edkins had not occupied a position of trust with the IRS, the Sixth Circuit then found the enhancement inappropriate. This precedent instructs that a defendant convicted of tax evasion may only be subject to the abuse-of-trust enhancement if the defendant is found to have abused a position of trust with the IRS itself.

There is one Sixth Circuit case to the contrary, that does not square with nor mention these cases.  In *United States v. Young*, 266 F.3d 468 (6th Cir. 2001), the defendant pled guilty to embezzlement and engaging in monetary transaction in property derived from unlawful activity based on actions he took while employed as a city manager for the city of Newaygo.  *Id*. at 475. Specifically, the defendant was charged with embezzling municipal funds into his fraudulent companies.

On appeal, the Sixth Circuit found that an abuse-of-trust enhancement appropriate. The Court relied upon the Third Circuit's decision in *United States v. Cianci*, 154 F.3d 106 (3d Cir. 1998), where the Third Circuit upheld an abuse of position of trust enhancement to defendant's tax evasion offense level based on the relevant conduct of defendant's underlying embezzlement activities. The Court cited with approval the Third Circuit's conclusion that the enhancement was appropriate where the defendant's abuse of trust enabled him to embezzle funds that he ultimately failed to report, and that the uncharged criminal embezzlement could be considered "related conduct" in applying the enhancement. The *Young* court ultimately determined that the District Court properly considered the defendant's embezzlement activities as relevant conduct to enhance the money laundering offense level for an abuse-of-trust.

There does not appear to be any precedent aligning these two separate lines of cases. Because the *Edkins-May-White* line of cases is more persuasive, and because it rests on a

decision that predates the *Young* decision, that line of precedent will be followed.  *See Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015) ("A panel of this court may not overturn binding precedent because a published prior panel decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.")

Importantly, the *Edkins-May-White* cases specifically address the question of who may be considered a victim in applying the abuse-of-trust enhancement.  *Edkins* explicitly held that a defendant charged with evading taxes should not receive the abuse-of-trust enhancement based on the defendant's abuse of trust with an entity other than the IRS.  By contrast, the *Young-Cianci* line of cases is primarily concerned with the question of relevant conduct.  Here, even if Ingersoll's conduct with GTA could be considered relevant conduct to his tax evasion conviction, the *Edkins-May-White* line of cases holds that GTA is not a qualifying victim. Under *Edkins*, unless Ingersoll abused a position of trust with the IRS – the victim of the crimes for which he is convicted – the enhancement is not appropriate in the Sixth Circuit. Ingersoll therefore will not be assessed a two point enhancement under U.S.S.G. § 3B1.3.

## B.

The second sentencing issue raised by the Government is whether Ingersoll should be assessed a four-point enhancement for his aggravating role in the conspiracy pursuant to U.S.S.G. § 3B1.1(a).  In relevant part, § 3B1.1 provides that a defendant's base level should be increased by four if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive…." *See* § 3B1.1(a).  The Government argues that the four-point enhancement is appropriate because Ingersoll led a conspiracy to commit tax evasion involving five people.  Ingersoll argues that there is no evidence that he

directed anyone other than Roy Bradley and that there is no evidence that Ingersoll directed Bradley to engage in any illegal conduct.

There is evidence that Ingersoll organized and led the BCA Charter School initiative, the Madison Arts construction project (executed by Bradley's construction firm), and the associated Front Porch Initiative.  The jury found Ingersoll and Bradley to have conspired to impede and obstruct the functions of the Internal Revenue Service in violation of 18 U.S.C. § 371 in order to advance the BCA initiative. While the evidence supports the jury's conclusion that Ingersoll and Bradley conspired to defraud the United States treasury in a number of ways, there is no evidence of Ingersoll's leadership "of a criminal activity" with respect to any third party other than Bradley, and no evidence that the conspiracy was "otherwise extensive."  *See* § 3B1.1(a). The four-point aggravated role enhancement of § 3B1.1(a) is therefore inapplicable, and the Government's objection will be overruled.

Under 3B1.1(c), even if criminal activity does not involve five or more participants or is not otherwise extensive, the base offense level should be increased by two "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity…." *Id*.  Because the jury found that Ingersoll and Bradley were engaged in a criminal conspiracy to commit tax evasion, and because the evidence suggests that Ingersoll directed and managed Bradley's conduct related to that conspiracy, Ingersoll will be assessed two guideline points under 3B1.1(c).

## C.

Defendant Ingersoll next objects to the assessment of two additional guideline points for using sophisticated means to commit the offense under U.S.S.G. § 2T1.1(b)(2). The sophisticated means enhancement applies to conduct pertaining to the execution or concealment of an offense

- 33 -

that is "especially complex or especially intricate." *United States v. Finley*, 600 F. App'x 964, 967 (6th Cir. 2015) (citing U.S.S.G. § 2B1.1 cmt. 9(B)).   The Sixth Circuit has held that a defendant's use of specialized knowledge that an ordinary taxpayer would not have may be particularly relevant in determining whether a defendant used sophisticated means in committing tax evasion. *See United States v. Daulton*, 266 F. App'x 381, 388-89 (6th Cir. 2008) (holding that the sophisticated means enhancement was appropriate where a defendant not only lied on his clients' tax forms, but also used his specialized knowledge of the industry in order to calculate and list deductions and expenses commonly incurred in the industry but not actually incurred by his clients).  "[S]ophisticated means are identified by their complexity, intricacy, or planning, not their ultimate success." *United States v. Clear*, 112 F. App'x 429, 431 (6th Cir. 2004) (citing § 2T1.1(b)(2), cmt. 4).

While the accounting and financial information associated with the case is extensive and challenging to organize, there is nothing particularly sophisticated about Ingersoll's transfer of SSM and SSI funds to himself. There is no evidence of specialized industry knowledge or complex planning regarding Ingersoll's transfers of funds as summarized in the Bill of Particulars.  If anything the transfers suggest that Ingersoll was *unsophisticated* in the area of corporate tax law, and brazenly disregarded more sophisticated advice. Ingersoll's objection to the sophisticated means enhancement is merited, and the two-point enhancement will not be used in determining Ingersoll's guideline range.

**D.**

The parties next dispute whether Ingersoll has attempted to obstruct justice within the meaning of U.S.S.G. § 3C1.1.  The application notes to § 3C1.1 explain that the provision "is not intended to punish a defendant for the exercise of a constitutional right." *Id*. at cmt. 2.  Thus

conduct falling outside of the provision includes a defendant's "denial of guilt" and "refusal to admit guilt or provide information to a probation officer…." *Id*.   Providing incomplete or misleading information that does not amount to a material falsehood generally falls outside the scope of the obstruction of justice enhancement. *Id*. at cmt. 5(C). A review of the Government's objections satisfies the Court that at most Ingersoll provided incomplete or misleading information by error or as a product of sloppy bookkeeping practices. *See* Defendant Ingersoll's Supp. Brief Regarding Obstruction of Justice Accusations, July 5, 2016, ECF No. 318. He did not provide materially false information, and accordingly the obstruction of justice enhancements under § 3C1.1 will be denied.

## E.

The next contested issue is the proper assessment of Defendant Ingersoll's tax loss from 2009 to 2011.   This calculation requires consideration of a number of different disputes, including (1) whether the conduit theory exception to the determination of taxable income is applicable, (2) the extent to which interest and penalties should be included in the tax loss computation, (3) whether Defendant Bradley's reported but unpaid tax liabilities should be included in the computation of Ingersoll's tax loss, (4) the proper classification of money transfers from Ingersoll's wholly owned entities to Ingersoll, and (5) whether Ingersoll can now claim previously unclaimed expense and depreciation deductions.

### i.

Before proceeding to these issues, attention must be given to a few preliminary points. First, the Court will provide a brief review of the methodology used by the Government to determine the criminal tax loss attributable to Defendant Ingersoll, as explained by IRS Special Agent Nicholas Russo and well summarized by the Government in a supplemental brief. *See*

Gov'ts Brief Regarding Methodology for Calculating the Criminal Tax Loss for Steven Ingersoll, ECF No. 322.   Second, the Court will address the Government's motion to strike or exclude all versions of Ingersoll's proposed exhibits A-5, A-6, A-7, 101A and 101B.  *See* ECF Nos. 276, 281, 294, and 309.

**a.**

For offenses involving the filing of a tax return in which gross income was underreported U.S.S.G. § 2T1.1(c)(1) n. (A) provides that "the tax loss shall be treated as equal to 28% of the unreported gross income … plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made."   The government alleges that the presumptive 28% rate should not apply because it is able to make a more accurate determination of the total tax loss attributable to Defendant Ingersoll.

In order to calculate Ingersoll's tax loss, the government first calculated the amount of unreported income that Defendant Ingersoll received from SSM and SSI during the 2009 year, as listed in the Bill of Particulars and set forth in section I.B.ii. infra. *See* Ex. 533 p.1.   The government next subtracted the amount of money that Ingersoll returned to SSM and SSI. Utilizing a "conservative" approach, the government also subtracted the earnings Ingersoll reported in his 2009 tax return at Schedule C (pertaining to SSM and SSI) from the total amount of the transfers. Finally, the government subtracted money identified in Ingersoll's Quickbook accounts as shareholder loans to Ingersoll.[4] These calculations resulted in a total unreported income of $586,643.93 for the 2009 year. *See* Ex. 533B. To calculate the tax due on that income, the IRS agent input Ingersoll's original 2009 tax return information and the $586,643.93 unreported income into a software program. The result, with the unreported income, was that

---

[4] The government later decided that this final subtraction was inappropriate after discovering several sets of Quickbooks, each showing different shareholder loan amounts.

Ingersoll no longer qualified for $5,867 in itemized deductions and $683 in exemptions that he had claimed in his 2009 Return. *See* Ex. 540. This resulted in a total adjustment of $593,194, which, added to Ingersoll's previous reported taxable income of $278,377.00, resulted in a corrected taxable income of $871,571. *Id*. Using the 2009 tax rate for taxpayers filing under the status of married filing jointly, the government determined Ingersoll's corrected income tax liability was $275,412. *Id*. The government then added $2,536 in self-employment tax related to the $150,000 Schedule C income, bringing the total corrected tax liability to $277,948. *Id*. Subtracting $77,722, the total tax reported in Ingersoll's original 2009 return, the Government determined that Ingersoll's unreported tax liability for 2009 was $200,226. *Id*. Pursuant to the civil fraud penalty, 26 U.S.C. § 6663, the Government added penalties and interest, resulting in a total amount due of $411,528.04 for the 2009 year. *See* Ex. 543.

The Government used the same methodology for the 2010 and 2011 years. For 2010, Ingersoll was determined to have $530,667 in tax due, plus $397,624.50 in penalties and $121,795.34 in interest. *Id*. Altogether, Ingersoll's total personal tax due for 2010 was calculated as $1,050,086.84. *Id.* Similarly for 2011 Ingersoll was determined to have $942,132 in tax and $104,868.73 in interest. The Government did not apply the civil fraud penalty for 2011 because Ingersoll was not convicted of tax evasion for that calendar year. Instead, the Government applied only an accuracy penalty under § 6662, resulting in $188,426.40 in penalties. Adding $2,631.47 in outstanding liabilities from Ingersoll's 2011 return resulted in $1,238,058.60 of total personal tax due for the 2011 year. *Id*.

Because Ingersoll was convicted of a conspiracy to commit tax evasion under 18 U.S.C. § 371 for the 2011 year, the Government also included the tax loss of his alleged co-conspirators Gayle Ingersoll and Roy Bradley in computing Ingersoll's total tax liability. Using the same

methodology as used for Defendant Ingersoll, the Government determined that Gayle Ingersoll owed a total of $439,815.78 for the 2011 year. *See* Ex. 543. In arriving at this figure, the government removed a $934,000 expense that Gayle Ingersoll had reported on Schedule C of his 2011 tax return. Gayle Ingersoll had claimed the expense as a payment to an alleged subcontractor, Mid-Michigan Geothermal. The government removed the expense upon determining that the subcontractor had not actually been paid. The government also added $12,375 in payments Gayle Ingersoll had allegedly received from SSI or Front Porch Renaissance Group that he had not reported on his original return. Finally, the government also subtracted $1,067 in increased self-employment deductions. After reaching a total adjustment of $928,145, the government used the 2009 tax rate for taxpayers filing under the status of single and determined Gayle Ingersoll's corrected income tax liability was $298,945. *See* Ex. 536. The government then added $ 36,461 in self-employment tax, plus $25 in earned income credit, resulting in a balance due of $335,406. *Id.* Gayle Ingersoll's total tax loss figure also includes $67,076.20 in penalties and $37,333.58 in interest. *See* Ex. 543.

With respect to Roy Bradley's 2011 tax liability, the government determined that he owed $244,612 in tax, $48,922.40 in penalties, and $27,227.76 in interest. This, together with Bradley's reported but unpaid tax liability of $243,631.12, resulted in $564,393.28 total personal tax due for the 2011 year. *See* Ex. 543. In arriving at this number, the government reduced Bradley's Thunder Builders expenses listed on Schedule C by $28,392 after determining that he had double counted the amount. *See* Ex. 537. The government also included the $934,000 that Bradley was allegedly entitled to under the BCA construction contract and that he subsequently transferred to Gayle Ingersoll (as discussed in more detail below). Bradley allegedly claimed a portion of the $934,000 on his 2011 amended return. Using the adjustments, the Government

- 38 -

applied the 2009 tax rate for taxpayers filing under the status of married filing jointly, and reached a corrected income tax liability of $403,618.  The Government then added $45,791 in self-employment tax. The government then subtracted the $204,297 that Bradley had reported in his 2011 Return. *Id*.

The Government also calculated the unreported employment tax for Bradley's company, Thunder Builders.  Considering the unreported cash wages Thunder Builders allegedly paid its workers, the government concluded that Bradley owed $649,307.92 in employment tax.

By combining Ingersoll's personal income tax from 2009, 2010, and 2011, along with interest and penalties from each year, together with the tax loss, interest and penalties of his alleged co-conspirators Roy Bradley and Gayle Ingersoll for the 2011 year, the government concluded that Defendant Ingersoll's total tax loss was $3,788,797.18. *See* Ex. 543.

**b.**

Turning to Ingersoll's proposed exhibits A-5, A-6, A-7, 101A and 101B, which present information allegedly in support of various tax theories and previously unclaimed tax credits, deductions and exemptions to which Ingersoll believes he is entitled,  the Government argues that the exhibits should be stricken as untimely, unsubstantiated, and inconsistent.  Because the exhibits were introduced with adequate time for analysis and response, the government's requests will be denied and the exhibits will be taken into consideration.  In considering the exhibits, however, the Court has sought to make an independent inquiry into whether the exhibits are sufficiently substantiated and consistent to support the relief Ingersoll requests pursuant to U.S.S.G. § 2T1.1 comment 3.

**ii.**

Defendant Ingersoll first argues that SSM and SSI transfers should not be included in the tax loss assessment because he was transferring the funds to himself from SSM/SSI for corporate purposes and merely as an agent of SSM and SSI. Accordingly, Ingersoll argues the funds do not constitute personal taxable income. Generally, transfers of funds constitute taxable income "when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *Rutkin v. United States*, 343 U.S. 130, 137 (1952). Under the "conduit theory" however, "a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit." *Diamond v. Commissioner*, 56 T.C. 530, 541, 1971 WL 2461 (1971), *affd*. 492 F.2d 286 (7th Cir. 1974). For this reason, money that a taxpayer receives in his capacity as a fiduciary or agent does not constitute taxable income to that taxpayer. *See Herman v. Commissioner*, 84 T.C. 120, 134–136, 1985 WL 15300 (1985). "[A] shareholder who takes personal control of corporate funds is not taxable on them so long as it is shown that he held the funds as an agent of the corporation and/or deployed them for a corporate purpose." *Rogers v. C.I.R.,* 102 T.C.M. (CCH) 536 (T.C. 2011), *aff'd*, 728 F.3d 673 (7th Cir. 2013). In determining whether gains are taxable income or non-taxable under the conduit theory, the controlling factor is the economic benefit accruing to the taxpayer. *Id*.

Ingersoll's argument that all "non-Webster House expenses" qualify as "conduit" spending because they were incurred on behalf of SSM and SSI is without merit. Ingersoll's argument that he was a mere conduit for SSM and SSI is contradicted by the jury findings that he used the funds for personal reasons, and no evidence was submitted that SSM or SSI had a business purpose for making the non-interest bearing loans, or that Ingersoll was acting merely as an agent and not the principal of the entities he alone controlled. The evidence is that

Ingersoll and only Ingersoll arranged the SSM/SSI transfers to himself and then titled most of the assets acquired with SSM/SSI funds in his personal name without any plan for repayment, any reason to return the funds, or any collateral to secure the alleged repayment obligation. Moreover, the record suggests that Ingersoll, and not SSM or SSI, received and was intended to continue receiving the economic benefits of the relevant transactions.

The "conduit" argument does however have merit as applied to the $934,000 transferred initially by Defendant Roy Bradley's draws from Chemical Bank. The transactions, as explained in Defendant Bradley's Presentence Investigation Report, are as follows:

> On February 7, 2011, Ingersoll obtained a $508,000.00 draw on the Chemical Bank construction loan. Out of that draw, on February 8, 2011, Ingersoll sent $400,000.00 to a business account belonging to ROY C. BRADLEY, SR., and Tammy Bradley. On February 10, 2011, BRADLEY wrote a check for $200,000.00 which was deposited into Gayle Ingersoll's personal account. The same day, February 10, 2011, Gayle Ingersoll wrote a check for $200,000.00 which was deposited into the personal account of Steven J. Ingersoll and Deborah Ingersoll. Shortly after, Ingersoll moved $190,000.00 through his various business entities and onto the books of the Grand Traverse Academy's payroll account administered by SSM. In May of 2011, a similar set of transactions involving $30,000.00 were conducted by the same people, however, in this instance the money was used by Steven J. Ingersoll to buy additional real estate in Bay City.

> On June 29, 2011, and June 30, 2011, Steven J. Ingersoll choreographed a series of financial transactions that wire transferred a $704,000.00 draw from the Chemical Bank construction loan on his Madison Arts account to ROY C. BRADLEY's and Tammy S. Bradley's construction company account. Tammy S. Bradley wire transferred $704,000.00, to an account for Gayle R. Ingersoll's fictitious Mid-Michigan Geothermal business, and Gayle R. Ingersoll wired $704,000.00 into Steven and Deborah Ingersoll's personal account. Steven J. Ingersoll then transferred $700,000.00 to his account for SSI and then to his SSM account, and eventually deposited $700,000.00 into Grand Traverse's account on June 30, 2011, the last day of the school's fiscal year end.

See Bradley PSR ¶¶ 13-14.

At first glance, to any reasonable person the series of transactions appears to reflect a money laundering operation, but the testimony did not support such a conclusion. On the

contrary, the testimony demonstrated that Defendant Ingersoll initiated each transaction with his brother's assistance in an urgent effort to remit funds to GTA.  The testimony of Gayle Ingersoll together with the testimony of Tammy Bradley reflected that Gayle arranged for the funds to pass through their accounts as the fastest way to move the funds to Defendant Ingersoll without Tammy learning his brother's account information.  Because Gayle Ingersoll and the Bradleys were acting as a mere conduits in transferring the $934,000 and did not actually receive any economic benefit from the funds, neither Gayle Ingersoll nor the Bradleys' receipt of the $934,000 will be included in the calculation of Ingersoll's tax loss.[5]

Also, the $934,000 is not taxable to Defendant Steven Ingersoll.  The funds were loan proceeds that he and Madison Arts, LLC remained obligated to repay to Chemical Bank.

### iii.

Defendant Ingersoll next argues that interest from 2011 should not be included in his tax loss assessment. The general rule is that "tax loss does not include interest or penalties." U.S.S.G. § 2T1.1 cmt. n. 1; *see also United States v. Thomas*, 635 F.3d 13, 16 (1st Cir. 2011); *United States v. Hunerlach*, 197 F.3d 1059, 1069–70 (11th Cir. 1999); *United States v. Hopper*, 177 F.3d 824, 832 (9th Cir.1999). The guidelines commentary was amended in 2001 to add a narrow exception to this general rule, requiring interest and penalties to be included in the calculation of tax loss in cases involving "willful evasion of payment cases under 26 U.S.C. § 7201 and willful failure to pay cases under 26 U.S.C. § 7203." U.S.S.G. app. C, amend. 617 (amending § 2T1.1 cmt. n. 1). The Sentencing Commission explained that "the nature of these cases is such that the interest and penalties often greatly exceed the assessed tax amount constituting the bulk of the harm associated with these offenses."  U.S.S.G. app. C, amend. 617.

---

[5] Ingersoll's accountant testified that he recommended reporting the $934,000 to the Internal Revenue Service, together with a false associated expense because he believed that failing to include the funds in income could result in more trouble for Gayle than a false report of an offsetting expense.

In *United States v. Lombardo*, 582 F. App'x 601, 619 (6th Cir. 2014), a case that involved willful evasion an under § 7201 and a conspiracy charge under 18 U.S.C. § 371, the Sixth Circuit held that the district court "did not abuse its discretion when it included interest and penalties" in calculating the defendant's tax loss. The Court instructed that, when determining the tax loss attributable to the offense, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." *Id*. citing U.S.S.G. § 2T1.1 cmt. n. 2. The Court explained that the phrase "all conduct violating the tax laws" must refer to "all relevant criminal conduct underlying the charged offense… including tax loss resulting from uncharged conduct."   Here, Ingersoll has been convicted of willful evasion of payment under 26 U.S.C. § 7201, and therefore *Lombardo* is applicable.

Ingersoll nevertheless argues that interest and penalties should not be included in the tax loss calculation for 2011 because no one in this case was convicted of a § 7201 offense for the 2011 tax year.  Ingersoll is correct, and accordingly interest should not be included for the 2011 year. *See, e.g., United States v. Schlegel,* No. 13-CR-0074(1) PJS, 2015 WL 1178283, at *2 (D. Minn. Mar. 13, 2015) (holding that the defendant's tax loss computation did not include interest and penalties where the defendant was not convicted of any offense under § 7201 or § 7203 for the years at issue).

### iv.

Ingersoll next argues that Gayle Ingersoll's tax liability and Roy Bradley's reported but unpaid tax liabilities should not be included in his tax loss assessment. As explained by the Sixth Circuit in *Lombardo*, "a defendant's sentence [in a tax loss case] may be based on both the tax loss that he caused directly and the tax loss caused by his coconspirators, if that loss was

reasonably foreseeable to the defendant." *Lombardo,* 582 F. App'x at 619-20. The *Lombardo* Court held that the District Court properly included co-defendant tax loss in determining the appellant's sentence, since the co-defendant's tax loss was reasonably foreseeable to the appellant. A sentencing court is not required to find that the co-conspirators "walked arm-and-arm" with one another. *United States v. Schroeder,* 500 F. App'x 426, 438 (6th Cir. 2012). Instead, the conduct must just be reasonably foreseeable as part of the conspiracy.

At trial, a jury found both Ingersoll and Bradley guilty of a conspiracy to commit tax evasion in violation of 18 U.S.C. § 371. The jury therefore found that the government had proved beyond a reasonable doubt that Bradley had joined the conspiracy to commit tax evasion knowing of the conspiracy's objectives, and intending to help further or achieve those objectives. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 443 n.20 (1978). The jury was not asked to so find with respect to Gayle Ingersoll, and there was no evidence submitted that Ingersoll or Bradley included Gayle in any of the project financing discussions. For this reason, Gayle Ingersoll's tax liability should not be included in Defendant Steven Ingersoll's tax loss assessment.

The question of whether Bradley's reported but unpaid tax liabilities should be included in Ingersoll's tax loss assessment turns on the objectives of Defendants' tax evasion conspiracy. The jury concluded that the objective of the conspiracy was for Ingersoll to evade his tax liabilities and use the untaxed capital to develop BCA and the Front Porch initiative. The jury also found that Bradley joined Ingersoll intending to achieve that objective, ostensibly by reducing expenses in order to complete the renovation on the limited funds Ingersoll had available. While this is true, there was no evidence offered that Bradley's tax avoidance itself was part of the conspiracy, apart from Bradley's failure to withhold funds for his employees.

- 44 -

Ingersoll had no knowledge or participation in Bradley's tax return preparation. With the exception of unpaid liabilities for Bradley's employees at Thunder Builders that were knowingly contributed to the conspiracy, Bradley's unpaid tax liabilities should not be included in Ingersoll's tax loss assessment.

**v.**

The fourth contested issue concerning the proper assessment of Ingersoll's tax loss from 2009 to 2011 is the proper classification of financial transfers to Ingersoll from entities he owned or controlled. Under USSG § 2T1.1(1), if a defendant's charged offense "tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."

Under §§ 301 and 316, a corporate distribution is a dividend which must be included in a shareholder's gross income as ordinary income under §§ 301(c)(1) and 61(a)(7) if the distribution comes out of either (1) earnings and profits of the current taxable year or (2) earnings and profits of the corporation accumulated after February 28, 2013. If the distribution does not come out of current or accumulated earnings and profits, then the distribution is treated as a return of capital to the shareholder resulting in a reduction of the adjusted basis of the shareholder's stock. *See* § 301(c)(2). If the distribution exceeds the adjusted basis of the stock, then the excess is ordinarily taxed as a capital gain, which receives a preferential rate under the current tax code.

Emphasizing the Supreme Court's decision in *Boulware v. United States*, 552 U.S. 421 (2008), Ingersoll argues that the income he received from SSM should be taxed at the reduced

capital gains rate.[6] Ingersoll argues that payments he received from SSM and/or SSI cannot qualify as dividends under 26 U.S.C. §§ 301 and 316(a) because it is undisputed that SSM had no accumulated earnings and profits, and they therefore should be taxed at capital gains rates. In *Boulware,* the defendant was charged with several counts of tax evasion and filing false income tax returns stemming from his diversion of funds from a closely held corporation of which he was president, founder, and controlling shareholder. *Id.* at 425. The case presented the issue of "whether a defendant accused of criminal tax evasion may claim return-of-capital-treatment without producing evidence that either he or the corporation intended a capital return when the distribution occurred." *Id*. at 424. The Court held that no such showing was required *Id*. Instead, the Court found that the economic reality of the tax obligation as governed by 26 U.S.C. §§ 301 and 316(a) governs the tax consequences of constructive distributions, and thus the existence of a tax deficiency under § 7201 (which the government must prove beyond a reasonable doubt). The Court observed that "Sections 301 and 316(a) together thus make the existence of 'earnings and profits' the decisive fact in determining the tax consequences of distributions from a corporation to a shareholder with respect to his stock." *Id*. at 425. The Supreme Court specifically held that "even diverted funds may be seen as dividends or capital distributions for purposes of §§ 301 and 316(a)." *Id*. at 430.

Importantly § 301, and therefore *Boulware*, "is not applicable to an amount paid by a corporation to a shareholder unless the amount is paid to the shareholder *in his capacity as such*." *See* 26 C.F.R. § 1.301-1(c) (emphasis added). For this reason, transfers to shareholder-employees as compensation for services, shareholder-vendors as payment for property,

---

[6] The present case is somewhat distinguishable from *Boulware*. At issue in *Boulware* was whether a tax deficiency existed, which is an element of § 7201 that the Government must prove beyond a reasonable doubt. Here, by contrast, the operative question is the amount of Ingersoll's tax liability for sentencing purposes, which the Government need only satisfy by a preponderance of the evidence. This difference in burden of proof is ultimately irrelevant, since, as discussed below, § 301 is not implicated in this case.

shareholder-lessors as rent for use of property, or any other transfer in which the corporation receives equal value from the shareholder are not governed by § 301 but by other sections of the tax code. *See C.I.R. v. Fender Sales, Inc.*, 338 F.2d 924, 929 (9th Cir. 1964). On the other hand, "[t]he crucial concept in finding a constructive dividend is that the corporation conferred an economic benefit on the stockholder without expectation of repayment." *Id*.

The evidence at trial and at sentencing did not demonstrate that SSM and SSI's distributions were made to Ingersoll in his capacity as a shareholder. Instead, the evidence suggested the distributions were made as compensation for Ingersoll's management services. As the manager and sole shareholder of SSM and SSI, Ingersoll caused the entities to initially under-compensate him for his services, and then later withdrew funds as additional compensation. The value of Ingersoll's management services is reflected by the fact that Ingersoll continued to draw income from SSM into the 2016 calendar year, purportedly to provide the new management company guidance with respect to regulation, compliance, and reporting, as well as the requirements of the State of Michigan, LSSU, and GTA's bond issue. *See* Supp. Sentencing Exhibits, ECF No. 303. The transfers to Ingersoll therefore are not distributions governed by § 301, but compensation for services that is taxable as ordinary income.

### vi.

At the sentencing hearing, Ingersoll argued that he should be able to disclaim certain SSM and SSI distributions that did not benefit him and claim previously unclaimed deductions for the tax years at issue. Section 2T1.1 comment 3 provides as follows:

> In determining the tax loss, the court should account for the standard deduction and personal and dependent exemptions to which the defendant was entitled. In addition, the court should account for any unclaimed credit, deduction, or exemption that is needed to ensure a reasonable estimate of the tax loss, but only to the extent that (A) the credit, deduction or exemption was related to the tax offense and could have been claimed at the time the tax offense was committed;

- 47 -

(B) the credit, deduction, or exemption is reasonably and practicably ascertainable; and (C) the defendant presents information to support the credit, deduction, or exemption sufficiently in advance of sentencing to provide an adequate opportunity to evaluate whether it has sufficient indicia of reliability to support its probable accuracy.

*Id*. Ingersoll has the burden to establish his claimed credits, deductions, and exemptions by a preponderance of the evidence. *Id.* As noted in section II.E.i.b. supra, Defendant Ingersoll's claimed deductions were timely provided in advance of sentencing.

**a.**

Ingersoll first argues that certain payments (Ingersoll identifies them as "[u]naccounted for SSM/SSI Distributions") should not be included in the calculation of his income. For the year 2009, he alleges that the payments made from SSM and SSI accounts to Excel Management, a company formerly known as IVL, Inc., should not be included  The payments are listed in the Government's Exhibits 533B, 534B, and 535B above, (listed as transfers to Excel-BOA 0599) and included in its calculation of Ingersoll's personal income.  Ingersoll explains that he founded the entity along with Bruce Christenson, a former colleague of Ingersoll's from Battle Creek and member of the GTA board, and Mark Noss, the former treasurer and board president of GTA,[7] but claims that he transferred his ownership interest to his co-founders in 2006. *See* Ingersoll Sentencing Tr. 62-66, ECF No. 262.  He argues that the recent cash flow from SSI to Excel was payment for Patty Engler's management of the IVL-in-school program and the training service

---

[7] In April of 2014 Mark Noss developed an entity called Full Spectrum Management which now operates as the management company for GTA.  As explained by Rick Lowe, former accountant for Full Spectrum Management, from the time of its establishment and throughout Ingersoll's trial and sentencing hearings Full Spectrum Management has continued to pay Defendant Ingersoll $12,500 per month for use of "intellectual property".  *See* Supp. Sentencing Exhibits, ECF No. 303. On March 15, 2016 Accountant Lowe sent an email to Brad Habermehl disclosing the payments.  While he acknowledged that GTA had no direct financial exposure from the payments, he opined that it was inappropriate for Noss to continue using Ingersoll for advice on running a management company, cash flow management, and budgeting because Ingersoll was the subject of ongoing criminal proceedings. *Id*. In a response, Noss acknowledged the payments, and explained that he had continued to speak with Ingersoll "for guidance with respect to regulation, compliance, and reporting, as well as the requirements of the State of MI, LSSU, and our bond issue."

she provided at doctor offices around the country.  The important thing, Ingersoll argues, is that he neither derived any income from Excel nor had any ownership in Excel during the relevant periods.  In response the Government asserts that Ingersoll was a signatory on the relevant Excel account, Excel-BOA 0599.  While Ingersoll's narrative suggests the expenses may have been related to the operation of other business entities and not him personally, he has provided no contracts, receipts, documents, or other evidence in support of his claim. Nor has the Court been furnished any explanation regarding the nature of the services.  Because he has not presented evidence with sufficient indicia of reliability in support of his claim, he has not met his burden of establishing the claimed exclusion by a preponderance of the evidence.

For 2009 Ingersoll also alleges that certain payments to American Equity Funding listed in the Government's exhibits were SSM business expenses.  American Equity is founded and operated by Steve Whitlock who had a portfolio of rental and land contract sale purchased with funds from investors with a promised 12% annual return on investment.  Ingersoll alleges that SSM invested in the entity and obtained a return on investment of approximately $206 per month. Ingersoll points out that documents show SSM owned a 33.33% interest in the fund and that SSM was the payee on checks from American Equity Funding. Ingersoll has provided the Court with various receipts and payment histories in support of this claim.  Ingersoll has sufficiently substantiated his claim that payments to American Equity Funding should not be included in the calculation of his personal income.

For the 2010 year, Defendant Ingersoll argues that payments to Excel, American Express, Custom Closing Services, Great Lakes Vision Service, and Mark Noss are properly excluded from the calculation of his income.  As to the American Express payment, Ingersoll argues that the credit care bill was paid by SSM because the card was used by Ingersoll for business travel

on behalf of SSM.  He has provided no substantiation, such as receipts, for the claim that travel was business and not personal.

Ingersoll also does not present any substantiation for his claim related to Custom Closing Services.  Indeed, Ingersoll argues only that he does not know what Custom Closing Services is, and so cannot provide any explanation regarding the payment to that entity. He therefore has not satisfied his burden to present information to support the credit, deduction, or exemption demonstrating by a preponderance of the evidence that it has sufficient indicia of reliability to support its probable accuracy. *See* Section 2T1.1 cmmt. 3.

The payments to Great Lakes Vision Service and Mark Noss are related.  Ingersoll explains that Great Lakes Vision is an office owned by Noss in Grayling, Michigan. Ingersoll alleges that the payments to both were for the purchase of equipment, the use of Noss's facility, and staff for SSM training events unrelated to GTA.  In support of this claim, Ingersoll offers a picture of a piece of equipment that he allegedly purchased. Ingersoll has provided no other evidence to support the alleged purchase, including, for example, the purchase price or equipment use.  The picture alone does not establish that the payments to Great Lakes Vision and Mr. Noss were business expenses and not personal expenses.

Ingersoll also lists a number of objections to his 2011 tax loss calculations.  Ingersoll argues that $718,500 in net transfers from SSM/SSI to Madison Arts, LLC, Front Porch, LLC, and SSB should not be included in Ingersoll's unreported income.  Ingersoll also claims that the Government erroneously classified a $1,970.52 payment made on February 25, 2011 as a payment to Webster House, when in fact it was a payment to a Fifth Third account ending in 9225. Ingersoll alleges that that account belonged to the Bay City Steering Committee, which was the precursor to BCA.  Ingersoll has provided no legal authority in support of these claims,

and it is unclear why Ingersoll's use of the funds to further his personal Bay City projects should be excluded from his income calculations.

Ingersoll also alleges that the Government erroneously included a $5,000 payment from SSI to Ingersoll personally on October 25, 2011 that is not reflected in the SSI bank records. He suggests the inclusion is the result of yet another Quickbooks error. Notwithstanding the fact that this is a de minimus issue that likely will not affect Ingersoll's ultimate guideline range, if the payment is not reflected in the bank records (the best guide to the reality of Ingersoll's financial transactions), it should be excluded.

**b.**

Ingersoll also argues that, if his receipt of the SSM and SSI distributions is to be treated as personal taxable income, then he should be entitled to a number of deductible expenses and depreciation expenses under § 2T1.1.  While Ingersoll has not explained how he decided to claim some expenses but not all in his previously filed tax returns, the Government does not challenge his general entitlement to the unclaimed deductions. The government does argue that Ingersoll should be precluded from claiming deductions because he did not timely seek them and because he did not provide the government with sufficiently detailed invoices and receipts.  As addressed above, the substantiation for Ingersoll's unclaimed deductions as timely furnished to the Government and the Court and will be considered.

Through his testimony, bank records, and credit card statements Ingersoll has not only established that a portion of his income went to deductible business expenditures (e.g. for Webster House, Madison Arts, Front Porch Initiatives, etc.),  but he has also established the specific amounts of those expenditures. Similarly, Ingersoll has established that certain expenditures were for assets that may be depreciated.  Ingersoll will be permitted to take his

previously unclaimed deductions, and depreciation expenses as set forth in 101B.  He may not include any deductions already claimed in his original returns.

**F.**

The final disputed sentencing issue is GTA's request for restitution from Ingersoll. The Sixth Circuit has noted that neither the Victim and Witness Protection Act ("VWPA") nor the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, authorize restitution for tax crimes in violations of 26 U.S.C. § 7201. *See United States v. Kilpatrick,* 798 F.3d 365, 391 (6th Cir. 2015). However, Courts have determined that the MVRA does apply to conspiracy convictions under 18 U.S.C. § 371 as an "offense against property." *See United States v. McNair,* 605 F.3d 1152, 1221 & n. 107 (11th Cir. 2010); *United States v. Quarrell,* 310 F.3d 664, 677–78 (10th Cir. 2002); *United States v. Schlegel,* No. 13-CR-0074(1) PJS, 2015 WL 1178283, at *7 (D. Minn. Mar. 13, 2015).

Under the MVRA, the Court shall order a defendant convicted of a qualifying crime to make restitution to the victim of the offense. § 3663A(a)(1).  Restitution "is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction." *Kilpatrick*, 798 F.3d at 388.  Therefore, the relevant inquiry is the victim's loss, not the defendant's gain. *Id*.  "The government bears the burden of proving a victim's actual loss by a preponderance of the evidence." *Id*.

Having determined that the MVRA is applicable, the next question is whether GTA qualifies as a victim under that act.  "Victim" is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including … a person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." § 3663A(a)(2).  GTA's request for restitution will be denied.

As discussed above, the IRS, not GTA, was the entity directly harmed as the result of the offenses for which Ingersoll was convicted, and therefore is the proper victim under § 3663A(a)(2). Because GTA was not directly harmed by Ingersoll's tax evasion, GTA is not a victim such that restitution should be awarded.

Moreover, GTA never sought civil recourse for the alleged conversion, and evidence suggests that the board explored pursuing such a cause of action with counsel but ultimately rejected it. Evidence further suggests that GTA continued to renew its management agreements with SSM on unamended terms – for the full 12 percent of gross revenue not to exceed $2,000,000, and that the rebate agreement (including the unrebated "rebate" carried as an account receivable) were intended to satisfy the State Department of Education, and that the account receivable would be excused as soon as GTA was financially healthy.  This suggests that the board considered the possibility that GTA was obligated to excuse the SSM receivable prospectively to the extent that it could, despite the board's allegations in its restitution request that SSM continues to owe GTA repayment of the receivable. For these reasons, even if GTA were a proper victim, restitution is not mandatory in a case such as this where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." *See* § 3663A(c)(3)(B).

### III.

Accordingly it is **ORDERED** that the Government's motions to strike or exclude all versions of Ingersoll's proposed exhibits A-5, A-6, A-7, and 101, ECF Nos. 276, 281 and 294, are **DENIED**.

It is further **ORDERED** that the Government is **DIRECTED** to furnish the probation department and Defendant Ingersoll an amended calculation of Ingersoll's tax loss, reflecting the conclusions of this opinion and order, within **21 days** of the entry of this order.  Defendant Ingersoll will then have **14 days** to respond.

It is further **ORDERED** that the probation department is **DIRECTED** to prepare a modified PSR reflecting the conclusions of this opinion and order.

It is further **ORDERED** that a final sentencing hearing for Defendant Ingersoll is **SCHEDULED** for **December 15, 2016 at 2:30 PM.**


                                            s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

Dated: September 22, 2016

<table>
<tr><td align="center">PROOF OF SERVICE<br><br>The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 22, 2016.<br><br>             s/Michael A. Sian<br>             MICHAEL A. SIAN</td></tr>
</table>